# EXHIBIT A

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION


JEROLD S. RAWSON, on behalf    )
of plaintiff and a class,      )
                               )
                 Plaintiff,    )
                               )
     vs.                       ) No.  11 CV 8972
                               )
SOURCE RECEIVABLES MANAGEMENT, )
LLC, RESURGENT CAPITAL SERVICES,)
L.P., ALEGIS GROUP, LLC, and   )
LVNV FUNDING, LLC,             )
                               )
                 Defendants. )




           DEPOSITION OF TIMOTHY E. GOLDSMITH
                   April 29, 2013
                     8:59 a.m.
           201 Third Street, NW, Suite 1630
               Albuquerque, New Mexico




      PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:


TAKEN BY:  David M. Schultz
           Attorney for Defendants


REPORTED BY:  Deborah L. O'Connor, RPR, CRR
              New Mexico CCR No. 297
              Bean & Associates, Inc.
              Professional Court Reporting Service
              201 Third Street, NW, Suite 1630
              Albuquerque, New Mexico 87102


(6969K) DEB
```

Page 10

1    Q    How long did you spend looking?
2    A    Oh, 15 minutes, 20 minutes. I didn't
3  spend hours looking for folders and e-mails.
4    Q    Did you happen to be provided with a copy
5  of the e-mails that your coauthor provided to us?
6    A    I was provided with that, yes.
7    Q    She had a lot more e-mails than you.
8    A    Did she? She must be a lawyer.
9    Q    Well, she looked hard.
10   A    Yeah.
11   Q    How about for the 2010 and 2011 -- I'm
12 going to call engagement. That's probably not the
13 best phrase for it, but what did you do to find
14 those items?
15   A    So by 2010, can you be a little bit more
16 specific about what you're referring to?
17   Q    Well, it appears to me from reading the
18 e-mails that your contacting of the coauthor
19 occurred in the first part of 2010.
20   A    Right.
21   Q    And that you completed the article and it
22 became published in the first quarter or so of
23 2011.
24   A    Correct.
25   Q    So that span of time is what I'm talking

Page 11

1  about as far as the 2010 engagement.
2    A    So what I did there was -- so there was
3  a -- you know, a two-year gap between the initial
4  work that I had completed, and when I contacted
5  Nathalie Martin, I started another folder
6  associated with the manuscript. Okay? And so it
7  was that folder that I consulted to find e-mail
8  exchanges that occurred between Nathalie and
9  myself.
10   Q    So you kept e-mails in the same folder as
11 the drafts of the article? Is that it?
12   A    If not in the same folder, maybe a
13 subfolder with e-mails or something, you know.
14   Q    And how comfortable are you that you
15 exhausted your search of those folders to identify
16 the items?
17   A    Well, I can't be a hundred percent
18 confident that there's not another e-mail exchange
19 between Professor Martin and myself. Again, I
20 spent what I thought seemed like a reasonable
21 amount of time searching for those e-mails and for
22 those records.
23   Q    Well, as we go through those and we talk
24 about some of the e-mails and the other records, I
25 may have some other questions about did you look

Page 12

1  for this and do you know if this exists.
2    A    Okay.
3    Q    Let me mark this as No. 1.
4           (Exhibit 1 marked.)
5    Q    Do you recognize Exhibit No. 1?
6    A    I do.
7    Q    Could you tell us what that is?
8    A    Well, this is a document that I received
9  from the law firm that Ms. Combs represents.
10   Q    And it has some attachments, correct?
11   A    Correct.
12   Q    And the first attachment is what?
13   A    A report of expert witness, Timothy E.
14 Goldsmith.
15   Q    And after that?
16   A    This is the published paper on -- the
17 title is Testing Materiality Under the Unfair
18 Practices Acts: What Information Matters When
19 Collecting Time-Barred Debts?
20   Q    And after that?
21        MS. COMBS: And that, for the record, is
22 Appendix A, correct?
23        MR. SCHULTZ: Correct.
24        THE WITNESS: And Appendix B is my
25 curriculum vitae.

Page 13

1    Q    (By Mr. Schultz) So let's look at Appendix
2  B.
3    A    Okay.
4    Q    I'm not sure of the date of this. Is
5  there anything to be updated?
6    A    You know, it's pretty recent. I believe
7  when I submitted this it was -- I looked at -- at
8  my publications and grants and so forth, and it's
9  really quite recent. I mean, there may be one or
10 two minor additions but --
11   Q    If you think of it, let me know. Okay?
12   A    Okay.
13   Q    Because there's a lot on there. If it is
14 something that's relevant to this, then I'd like to
15 know about it?
16   A    Okay.
17   Q    If it's particularly on point to --
18   A    No, it would not be relevant to this
19 particular case.
20   Q    Okay. Good. So why don't you first just
21 tell me a little bit about your job at the
22 university. What is it you do, your title --
23   A    I'm associate professor of psychology at
24 the University of New Mexico. It's a standard
25 professor position. I teach --

4  (Pages 10 to 13)

**Page 14**

1     Q   Did you say "standard"?
2     A   A standard professor position. It is a
3 tenured professor position, if that's -- yes. I
4 teach undergraduate and graduate courses. I
5 supervise graduate students in their theses and
6 dissertations.
7         I'm on various committees of other
8 graduate students and undergraduate honor students.
9 I engage in service at the university both at the
10 departmental level and at the university level.
11 It's your typical professorship job.
12     Q   And how long have you been doing that?
13     A   I've been there since 1983. Thirty
14 years.
15     Q   It looks like you joined there after you
16 graduated -- after you -- about the time you got
17 your Ph.D., is that it?
18     A   Correct.
19     Q   So that's -- you've been employed there
20 for 30 years?
21     A   Correct.
22     Q   Have you ever acted as an expert witness
23 before?
24     A   I have never acted as an expert witness
25 before.

**Page 15**

1     Q   On the first page of your CV you have
2 some type of teaching experiences and research
3 interests, right?
4     A   Correct.
5     Q   The 2008 -- I'm going to call it 2008
6 engagement. Is there a better phrase for that?
7     A   The project is what I would say, but
8 engagement, whatever.
9     Q   All right. We'll try to use those
10 interchangeably, I suppose. So for the 2008
11 project, does the work you do fall within any of
12 the items identified on that first page?
13     MS. COMBS: I'm confused by the question.
14 Could you rephrase it?
15     Q   (By Mr. Schultz) Yeah, sure. I'll try.
16 I'm in your realm here in your CV, so it's hard for
17 me to fit exactly what I'm asking into that. But
18 you did a project in 2008, and I'd refer to it as
19 an Internet survey. Is that what you refer to it
20 as?
21     A   I don't like the term "survey." I'm sure
22 we refer to it as a survey in the document, but
23 more technically what we did was an experiment.
24     Q   When you say "more technically," is that
25 more technically from a scholar --

**Page 16**

1     A   Yeah, from kind of a research
2 perspective. Scientific methodology, just exactly
3 what was done in the design of the study and in the
4 data collection. Okay?
5     Q   And the difference between an experiment
6 and a survey, in your understanding, is what?
7     A   Okay. An experiment is a research study
8 where the researcher manipulates an independent
9 variable and has control over the assignment of
10 participants to the levels of that independent
11 variable. That's sort of a formal definition of an
12 experiment. But when we talk about an experiment
13 from a technical perspective, they should have
14 those two characteristics.
15         When you read about surveys, they are
16 much more general questionnaires that are given to
17 samples from populations. The questionnaires will
18 have some particular purpose or intent, but it's
19 just a set of questions. It could be various
20 formats, it could be multiple-choice answers, it
21 could be fill-in-the-blank answers, whatever.
22         But there's much less control over a
23 survey typically than in an experiment. And for
24 that reason, experiments are presumed to be better
25 if you're trying to answer some research question.

**Page 17**

1 If you can answer the question with an experiment,
2 that's generally preferable.
3     Q   Okay. So it seems like there's a
4 distinction that you've drawn between experiment
5 and survey.
6     A   Correct.
7     Q   And it seems like something that's
8 accepted within your field?
9     A   Uh-huh, that's correct. And if you look
10 at research methods books of the sorts of courses
11 that I teach, you will find distinct chapters in
12 experimental methods, and a survey would be
13 considered a nonexperimental method.
14     Q   Okay. What are some of the research
15 books that are recognized in the field that you are
16 involved in?
17     A   Well, at the undergraduate level?
18     Q   No, I'm not particularly interested in a
19 textbook that undergrads would use. But is there
20 something that people in academics or people
21 engaged in the research projects look to as
22 authoritative for helping them?
23     A   Yeah, I will give you one. It's called
24 The Design and Analysis of Experiments by Harold
25 Delaney. And I know that book well because he's my

Page 34

1    Q    It's not something that's done in your
2  field as much?
3    A    Not very often, yeah.
4    Q    Do -- what also distinguishes your CV
5  from the article here is there was a legal aspect
6  of the article, obviously, that you didn't seem to
7  have drafted.
8    A    That's correct.
9    Q    I didn't see any other articles -- other
10  projects on your CV that seemed similar in that
11  sense. Is that right?
12    A    That is correct.
13    Q    When you -- I'm almost done with the CV.
14    A    Okay.
15    Q    When you did these tests -- and I just
16  said "these" very broadly, obviously.
17    A    Okay.
18    Q    Is there a set number of people that
19  would typically fall within the -- let me --
20  experimental design?
21    A    Yeah, that's a good question. And that's
22  something that psychologists and researchers in
23  general are always concerned about, is the sample
24  size. And most often that gets answered with
25  respect to the statistical analyses and the power

Page 35

1  of the statistical test that you're performing,
2  okay? So we want sufficient sample size to allow
3  us to have the power that we need in carrying out
4  our statistical tests. So it is a concern, okay?
5        Just what is a sufficient sample size
6  varies greatly depending upon the experiment and
7  levels of your independent variable and whether it's
8  between subject manipulation or within subject
9  manipulation. So it's -- but it is an important
10  question.
11    Q    Do any of your publications address that
12  important question?
13    A    Well, almost all of the published papers
14  in the methods section address the question of
15  sample size somewhere.
16    Q    Because you had a sample, so you had to
17  say what the sample size was. I'm just saying, was
18  the focus of one of the articles about the proper
19  sample size?
20    A    So did I write an article where I looked
21  at the question of sample size in research?
22    Q    Right.
23    A    No.
24    Q    Is there -- in the experimental design
25  area, is there a publication of sorts that

Page 36

1  addresses the proper sample size --
2    A    Now, that book I mentioned earlier, the
3  Maxwell and Delaney textbook on experimental
4  design, that would be an issue that would be
5  addressed in the design of experiments and the
6  analysis of variants, is sample size.
7    Q    Why don't you put that aside.
8    A    Okay.
9    Q    This isn't specific to your CV, but I was
10  just wondering, when you go about having yours
11  published, is there a handful of places that you
12  turn to to get your articles published?
13    A    When you say "this published," are you
14  referring to this particular --
15    Q    No, on your CV generally. You were
16  retained, for instance, by the FAA, so it's not
17  like you went and published it. But other things,
18  you had different things published in different
19  journals, and it seems like there is an array of
20  different journals.
21    A    Right. And that's one of the things that
22  you just learn in an area that you work in, is what
23  journals would be appropriate, what journals would
24  be interested in these sorts of studies. So it
25  varies widely.

Page 37

1    Q    Do you think any of those publications
2  would have accepted your 2008 draft to be published
3  in that form?
4    A    The publications -- the journals that I
5  publish in in psychology would not be particularly
6  interested in the legal question addressed in this
7  study, and so that's why I didn't pursue
8  publication. And then, you know, in 2010, for some
9  reason, I thought, let's see who's over in the law
10  school. Maybe there's someone there that might do
11  empirical work and might be interested in seeing if
12  they can get this published.
13    Q    But the 2008 version isn't something that
14  they would have published as is?
15    A    No.
16    Q    What -- I've got a privilege log, and I'm
17  going to work around that, obviously. I'm not sure
18  I agree with it, but my questions go to the 2008 --
19    A    Okay.
20    Q    So let's kind of switch gears here,
21  unless there's anything else you want to add about
22  your CV.
23        How did you first become involved in that
24  2008 project?
25    A    I was contacted by Bill Keller from the

10  (Pages 34 to 37)

Page 38

1  New Mexico attorney general's office.
2      Q    Did you know Bill?
3      A    No.
4      Q    How did he know you? Do you know?
5      A    I think he got my name from going to the
6  UNM site, and I think he might have looked under
7  psychology, he might have looked under sociology.
8  I'm not sure. He somehow found my name and shot me
9  an e-mail.
10     Q    Here we are. So he sent you an e-mail
11  originally?
12     A    I think it was an original e-mail as
13  opposed to a phone call initially. In all honesty,
14  I can't remember.
15     Q    The privilege log identifies an e-mail
16  regarding Dr. Goldsmith being a potential expert
17  witness on January 25, 2008. Is that the e-mail
18  you're referring to, do you think?
19     A    It was in that time frame, yes.
20     Q    Prior to January 25, 2008, do you
21  remember having any involvement with Bill Keller or
22  this project?
23     A    None at all. Absolutely none.
24     Q    So if we use January of 2008, is that
25  probably a good --

Page 39

1      A    It's pretty close. It's somewhere in
2  that time frame.
3      Q    I was trying to put some time frame on it
4  myself.
5      A    Sure. Yeah, I think that was it.
6      Q    And do you have a copy of that e-mail
7  still, I take it?
8      A    If I -- if you have a copy, I must have a
9  copy.
10     Q    I don't have a copy.
11         MS. COMBS: If I have a copy.
12         THE WITNESS: If you have a copy, right.
13         MR. SCHULTZ: It's on your privilege log.
14         MS. COMBS: Then we do, yes.
15     Q    (By Mr. Schultz) After that e-mail, which
16  I understand was probably the -- probably the first
17  contact in regards to the 2008 engagement, do you
18  remember what happened next?
19     A    Well, Bill and I met. I think he was
20  working out of Santa Fe, so he came down. And we
21  met physically, and he explained to me in more --
22         MS. COMBS: Now, let's get this clear
23  about -- you can answer questions about
24  compensation, you can answer questions about
25  identifying facts or data that the attorney

Page 40

1  provided to you in connection with this. You can
2  answer questions about assumptions that the
3  attorney provided to you. But other than that, I
4  would ask you to keep privileged your discussion.
5         THE WITNESS: Okay.
6         MS. COMBS: But he's entitled to know
7  what you were paid, what facts were assumed, what
8  assumptions were made. And so you can testify to
9  that. Okay?
10         THE WITNESS: Okay.
11         MS. COMBS: Is that all right --
12         MR. SCHULTZ: I say sure in the sense I'm
13  not waiving my argument, because at some point I'm
14  going to ask for all of this stuff. But for
15  purposes of today, that's fine.
16         THE WITNESS: Can you restate the
17  question?
18     Q    (By Mr. Schultz) After January 25, 2008,
19  or around then, you had a subsequent communication
20  or contact with Bill Keller, right?
21     A    Correct.
22     Q    When was that?
23     A    I can't remember the exact date.
24     Q    You know what? That's a good point. I'm
25  not really all that particularly concerned about

Page 41

1  the exact date. If you can give me some time, a few
2  weeks later --
3      A    Probably within a couple of weeks.
4      Q    All right. And you met him?
5      A    I did.
6      Q    Where?
7      A    In my office.
8      Q    How long did the meeting last?
9      A    I would guess approximately an hour.
10     Q    Anyone else present?
11     A    I don't believe so on that initial
12  meeting with Bill. I can't be a hundred percent
13  positive about that.
14     Q    If somebody else was present in a meeting
15  with Bill, who would it have been?
16     A    It would have been Karen Meyers.
17     Q    Right. I saw her name.
18     A    Right.
19     Q    Who is Karen Meyers?
20     A    She is also with the attorney general's
21  office.
22     Q    So you're just not sure if she came with
23  him or not?
24     A    I can't remember whether she came at that
25  first meeting. She did come at some point. I did

11  (Pages 38 to 41)

Page 46

1 hand.
2     Q    In the time you worked with Bill, do you
3 know what kind of documents he gave you, if
4 anything, besides that complaint?  I refer to it as
5 a complaint.  Actually, was it the complaint?
6     A    Well, that's a legal term that I'm not
7 familiar with.  But it kind of looked like
8 something started off there.
9     Q    Sure.
10     A    I can't remember Bill providing other
11 documents.  I think maybe he did later on when we
12 got to the point of addressing some specific
13 questions about the methodology, okay?  I think
14 Bill provided some other examples that we were
15 looking at.
16     Q    But that would have been sometime the
17 summer --
18     A    Probably closer, yeah, towards the
19 summer.
20     Q    Do you remember when it was that Bill
21 gave you something in regards to the lawsuit
22 between New Mexico and Merchants'?  Do you remember
23 when that was?
24     A    In all honesty, I can't -- I don't know
25 exactly when that was.  Yeah.

Page 47

1     Q    So what else can you tell me about that
2 first meeting?
3     A    Well, I can tell you that I just, you
4 know, when I would look at a document like that,
5 that wouldn't really mean anything to me, okay?
6 This particular case, you know, document.  So, I
7 mean, I knew it was of interest to him.  He came to
8 me not because of any legal expertise that I had,
9 which I don't have, but rather because of my
10 research methodology expertise, because of my
11 expertise in cognitive psychology.
12     Q    So for purposes of this deposition I'm
13 going to try to avoid you getting into the exact
14 exchange you had with him, but if you could tell me
15 the subject matter of your discussion I'd
16 appreciate it.
17     MS. COMBS:  That's fine.
18     MR. SCHULTZ:  Any concepts you talked
19 about.
20     MS. COMBS:  And also any assumptions?
21     MR. SCHULTZ:  Yeah.
22     THE WITNESS:  So Bill told me that there
23 was a legal question that had to do with the issue
24 of materiality, and he said this is something that
25 gets debated back and forth in the legal world.

Page 48

1 And he was wondering whether, in fact, I could
2 design a study that would help answer this question
3 about materiality, and in particular obtain some
4 empirical data relevant to the question at hand.
5 And so the question at hand being if a consumer or
6 some debtor is provided with knowledge about this
7 debt and whether, in fact, the agency, the
8 corporation who was trying to collect the debt,
9 cannot sue that person in court, would that
10 information be relevant in the consumer's decision
11 about payment.  Okay?  So that's what we talked
12 about.  That was the -- that was the principal
13 question at hand.
14     Q    Had you heard of the concept of statute
15 of limitations prior to this?
16     A    I had never heard of that before.  Never
17 heard of materiality before.
18     Q    Okay.  How did the meeting end?
19     A    Well, as I recall, I said, "Well, I'll
20 think about it.  I'll see -- you know, try to
21 explore some ideas and see if I can come up with
22 something that might provide some empirical data
23 relative to this question at hand."
24     Q    Okay.  Do you remember what happened next
25 then in this project?

Page 49

1     A    Well, you know, at some point, I don't
2 know if it was exactly next, but I think I e-mailed
3 Bill or we talked on the phone, one, about some
4 ideas for carrying out this empirical study and
5 probably went back and forth on the, you know,
6 advantages and disadvantages of these, and
7 eventually we decided on the particular study that
8 was implemented.
9     Q    So are you telling me that an assistant
10 attorney general helped design the study?
11     A    Well, Bill didn't help design the study,
12 but Bill was important in providing the context for
13 the study, in kind of framing just, you know, what
14 is the question at hand and what sort of data would
15 be relevant to the case at hand.  So, you know, I
16 was the one who was designing the study.
17     Q    Can you provide me with his input as to
18 the context and data?
19     A    Well, part of the context was just
20 exactly what sort of information would a consumer
21 receive from a debt collection company and what
22 sort of additional information might be provided on
23 that document that could influence the consumer's
24 decision.  Okay?  So those are the issues that we
25 talked about.  I had never seen one of these debt

13  (Pages 46 to 49)

Page 50

1 collection letters before, so this was all
2 brand-new to me.
3    Q    You said that you received a copy of
4 the -- well, we called it the pleading, we're not
5 sure, but we think the pleading of New Mexico
6 versus Merchants', right?
7    A    Correct.
8    Q    And just now you said you think you may
9 have seen a collection letter?
10    A    I did see a collection letter at some
11 point. In fact -- and I think it was later on
12 there were perhaps two or three collection letters
13 that I saw. We were interested in crafting our
14 question so that it was representative of the sort
15 of questions and the sort of alternative responses
16 that were provided to consumers with these letters.
17 We wanted our question and alternatives to be
18 realistic.
19    Q    Do you know, were they all Merchants'
20 letters?
21    A    I can't remember that. I don't know if
22 they were or not. I think they might have been
23 from some different companies. Again, that was not
24 my call. That was not my area of expertise in
25 terms of, you know, what sort of wording, legal

Page 51

1 wording, do we want to put in this.
2    Q    We'll get to it, but the questions do
3 have some payment options. Were those payment
4 options ones identified on the letters you got?
5    A    Those were payment options that were
6 modeled after real letters, correct.
7    Q    You said you don't know if the letters
8 you saw were Merchants' letters or somebody else's
9 letters?
10    A    Correct.
11    Q    Do you remember -- and how many did you
12 see?
13    A    I'm guessing two or three.
14    Q    Did each of the letters you saw have the
15 same type of payment options?
16    A    Well, it was similar, yeah, similar sort
17 of set of options that the consumer is given.
18    Q    Because the letters -- well, the
19 survey -- strike that. Your question 6, I think,
20 had four payment options. Do you think the letters
21 had something like those four payment options?
22    A    Something like those, correct.
23    Q    Are you kind of speculating at this time
24 because you can't remember five years ago what was
25 on those letters?

Page 52

1    A    I can't remember five years ago what was
2 on the letters, okay? But, you know, to the best
3 of my recollection, we crafted our statement and
4 our alternatives to reflect these letters. A
5 particular letter might have been more relevant at
6 that point in time, but to try to make it, you
7 know, somewhat more general. Okay? We don't --
8 yeah.
9    Q    Did he hand you those letters, mail those
10 letters, e-mail those letters?
11    A    Oh, I don't remember. Most likely he
12 e-mailed them to me.
13    Q    And you don't have them?
14    A    They were not -- if they were not part of
15 the documents that -- part of the e-mails that I
16 submitted, then probably not.
17    Q    Nathalie didn't produce them either.
18    A    Okay.
19    Q    Do you know if you gave those letters to
20 anybody else to see, anybody that helped you on the
21 project?
22    A    I would guess the letters were probably
23 provided to the Institute of Social Research
24 because we were working with them in the
25 development and administration of the

Page 53

1 questionnaire. Again, you know, I can't say for
2 sure whether they were part of the conversation or
3 not.
4    Q    Have we, to the best of your recollection
5 anyhow, exhausted your recollection of the items
6 that were provided to you -- physically provided to
7 you in some form or another, the letters and what's
8 called the complaint?
9    A    From Bill Keller?
10    Q    Yeah.
11    A    I cannot think of anything else that Bill
12 gave me.
13    Q    All right. How about your second meeting
14 with Bill? Do you remember anything about the
15 second meeting with Bill?
16    A    Oh, boy.
17    MS. COMBS: I just want to get a
18 clarification. I'm not sure that the letters were
19 produced in the first meeting. I think that was --
20 your question seemed -- okay. I didn't want to
21 imply -- you're not sure when you got those
22 letters, right?
23    THE WITNESS: I'm not, no.
24    Q    (By Mr. Schultz) You obviously got them
25 before you drafted the questionnaire, though?

14  (Pages 50 to 53)

Page 54

1    A   Oh, yes, yes.
2    Q   And you did that in the summer?
3    A   Right.
4    Q   So you got them sometime between January
5 and May, let's say?
6    A   Correct, yeah. You know, it would be
7 difficult for me to kind of go through and say on
8 the second meeting, you know, we met here and we
9 talked about X, you know, topic.
10    Q   If you can't remember, that's fine. I'm
11 just asking.
12    A   I can't remember, yeah.
13    Q   You know you had a second meeting. Do
14 you know when it was?
15    A   Presumably two or three weeks after the
16 first.
17    Q   And you have no records of when the first
18 or second meeting happened?
19    A   Well, you know, I did not go back and
20 review my e-mails before this meeting to, you know,
21 identify dates, okay?
22    Q   Okay.
23    A   What I can say is that, you know, we had
24 several meetings over the course of months --
25    Q   Okay.

Page 55

1    A   -- beginning in January talking about the
2 project, designing the study, meeting with people
3 at the Institute for Social Research.
4    Q   And Bill was with you for the meeting
5 with the people at the institute?
6    A   At least one of them, correct.
7    Q   And do you remember when that was?
8    A   I would guess that probably would have
9 been later, maybe more in early summer.
10    Q   So why don't you tell me what you
11 remember about any of the meetings you had with
12 Bill prior to embarking on this experimental
13 project.
14    A   Well, the only discussions we had before
15 we actually embarked on designing and working on
16 the study is just Bill describing to me the nature
17 of the case and the sort of question that he was
18 trying to get some empirical data on.
19    Q   Nothing else strikes you as something you
20 remember about the meetings?
21    A   No.
22    Q   Had you ever heard of the New Mexico
23 Unfair Trade Practices Act prior to meeting Bill?
24    A   I don't think I had ever heard of it
25 before, no.

Page 56

1    Q   Is it a correct statement that the focus
2 of the project in '08 was dealing with the
3 New Mexico law, right, as opposed to some other
4 state's law or, finally, federal law, right?
5    A   Certainly the case that was of interest
6 to Bill was a New Mexico case, correct.
7    Q   In your considerations did the subject
8 matter of any other unfair trade practices act
9 besides New Mexico come up?
10    A   I don't -- no. I don't believe so.
11    Q   Did you ever look at that log?
12    A   I did not.
13    Q   Did you do any research prior -- from the
14 time you met with Bill to the time you crafted the
15 questions, I guess?
16    A   You know, I probably did some poking
17 around in Google, but nothing, you know, kind of
18 systematic research in terms of trying to
19 understand the laws and the issues involved in debt
20 collection, for example.
21    Q   Yeah.
22    A   No.
23    Q   You didn't do that?
24    A   Again, Bill's interest in me was my
25 experimental methodology and my knowledge as a

Page 57

1 cognitive psychologist and experimentalist. And I
2 really wasn't interested in the law either so --
3    Q   And I'm going to try to avoid dragging
4 into that, but, unfortunately, the project had some
5 component of that. So it's fair to say -- I think
6 you might have already said -- you didn't have any
7 part in drafting or anything to do with legal
8 analysis?
9    A   No, not at all.
10    Q   That's fine. I wouldn't have expected
11 it. Did you know what the FDCPA was in 2008?
12    A   I did not, and I'm not sure I could tell
13 you what that stands for even now.
14    Q   How about if I tell you?
15    A   Okay.
16    Q   The Fair Debt Collection Practices Act.
17    A   Okay. It does ring a bell now.
18    Q   Do you know anything about that act?
19    A   No, in all honesty not in any kind of
20 detail other than it's some consumer protection
21 kind of law.
22    Q   Sure.
23    A   Yeah.
24    Q   I think I touched on this, but did you
25 have any understanding of the concept of

15 (Pages 54 to 57)

Page 62

1     stage, yeah.
2         Q    So if I get it right, you, as I
3     understand it, drafted up the eight questions and
4     the responses?
5         A    Uh-huh.
6         Q    You shared your drafts with Bill?
7         A    Correct.
8         Q    Did Bill comment or edit them?
9         A    He did.
10        Q    Do you remember how he commented or
11    edited them?
12            MS. COMBS:  That I'll object to.  I
13    believe that's what the rules are designed to
14    prevent.  Any assumptions, yes, but not, you know,
15    changes.
16        Q    (By Mr. Schultz) Okay.  But you're saying
17    Bill made changes to your draft questions and
18    answers?
19        A    Bill had input on the particular wording
20    of the question and the alternatives --
21        Q    Okay.
22        A    -- to provide a realistic legal context
23    for what we were after.  We wanted them to be
24    realistic.
25        Q    Did Bill share with you his experiences

Page 63

1     in the collection industry that made him qualified
2     to provide what is realistic?
3         A    I don't believe Bill shared with me his
4     background as an attorney in that area.  I assume,
5     since he was working for the New Mexico attorney
6     general's office, he was well qualified to provide
7     this sort of input.
8         Q    That was your assumption?
9         A    Correct.
10        Q    Did you think to consult with anybody in
11    the collection industry about the questions?
12        A    Only indirectly in that we looked at
13    several letters from collectors, from debt
14    collectors, so consultation in that sense.
15        Q    You identified two or three letters?
16        A    Right.
17        Q    So now there were more than two or three
18    letters?
19        A    No, two or three is what I remember.
20        Q    We already talked about those.  Anything
21    else then?
22        A    I certainly didn't contact any debt
23    collection groups.
24        Q    Besides Bill, did Karen have any input on
25    the questions?

Page 64

1         A    Karen was involved, not as directly as
2     Bill, but I'm sure Karen looked at the questions.
3     I'm sure, I'm not a hundred percent certain, but
4     almost certainly she looked at it.  I can't
5     remember exactly their relationship, but I think
6     Karen might have been Bill's boss, if I'm not
7     mistaken.  So yeah.
8         Q    How about in regards to communications
9     with you, though?  Did Karen communicate to you
10    about the questions?
11        A    I don't remember direct communication
12    from Karen about the questions.
13        Q    So what was then done after you and Bill
14    and perhaps Karen agreed on the questions and
15    answers?
16        A    Well, we needed some means by which to
17    carry out this study, and by that I mean to find
18    participants, you know, collect the data.  And so
19    there is an institute at the University of New
20    Mexico called the Institute of Social Research.
21    And I contacted them, and they do professional
22    surveys.  That's one of the things that the
23    institute does.  And I said, "Is this something
24    that you could help us with?"  And they said,
25    "Yes."  And so that began interaction with them.

Page 65

1         Q    Okay.  Who did you deal with?
2         A    Paul Guerin is one name that just came
3     up.
4             MS. COMBS:  Do you now how to spell that
5     name?
6             THE WITNESS:  I believe it's G-U-E-R-I-N,
7     Guerin, was I think the primary contact there.
8         Q    (By Mr. Schultz) And he's also a professor
9     at UNM?
10        A    I don't think he has a professor title.
11    I think he has a Ph.D.  If it is, it's probably
12    some sort of research professorship.
13        Q    So what did Paul Guerin do?
14        A    Well, we showed him our survey, our
15    questions, we talked to him about the design, about
16    what we were interested in doing, and asked him
17    whether their group would be able to actually carry
18    this out for us.  One of the questions that I had
19    is whether in fact they would be able to randomly
20    assign the participants as they came into the study
21    to the two survey conditions.  And he said, "Yes,
22    we can do that."  So they looked over the
23    questions.  They may have had some comments,
24    some -- they're experts in that area also.
25        Q    You say "they."  Who is "they"?  I

17  (Pages 62 to 65)

Page 82

1  participate.
2      Q   Okay. Since I don't have the ad and I
3  don't see any reference to it -- hardly any
4  reference to it in any of the e-mails, although
5  perhaps they were held back --
6      A   I think it's -- is it not in the methods
7  section of the paper that we state that we put out
8  newspaper ads to solicit participants in the study?
9      Q   It says you put out an ad --
10     A   Okay.
11     Q   -- to get people to respond. But what
12 I'm saying is, I haven't seen anything about what
13 newspapers, how many times, the circulation,
14 anything about it. And that's what I'm trying to
15 find out, if you can tell me anything about it.
16     A   I'm sure I'm not going to be the best to
17 give you details there. I can tell you what I
18 remember. But, again, I think that was done by the
19 Institute of Social Research. They're the ones
20 that -- you know, that's the sort of thing that
21 they've done, that they're comfortable doing, you
22 know, that they do regularly.
23         My recollection is that we targeted
24 three or four of the largest cities in New Mexico.
25 Santa Fe, Albuquerque, Las Cruces, maybe Roswell.

Page 83

1  You know, I'm trying -- maybe Socorro. I can't
2  remember exactly.
3      Q   What was the last two? Socorro?
4      A   Socorro, yeah.
5      Q   How do you spell that?
6      A   Well, I can tell you how to spell it.
7  There's either two Cs or two Rs. S-O-C-O-R-R-O.
8      Q   And between Las Cruces --
9      A   Roswell.
10     Q   Oh, I've heard of that. I'm sorry, I got
11 you off track there.
12     A   But, yeah, I don't remember exactly how
13 many newspapers. And then people began responding
14 by going to the Internet site and answering the
15 survey items.
16     Q   But to the best of your recollection, it
17 went into a newspaper in perhaps four cities, four
18 separate newspapers?
19     MS. COMBS: Five.
20     Q   (By Mr. Schultz) Five separate newspapers?
21     A   Four or five, yes.
22     Q   Four or five separate newspapers in four
23 or five separate cities?
24     A   Correct, to target the biggest newspaper
25 in each of those cities.

Page 84

1      Q   And did you see what the ad looked like?
2      A   Again, I'm sure I saw the ad at some
3  point in time. Whether I ever got a copy of it or
4  not, I'm not sure.
5      Q   Can you tell me, to the best of your
6  recollection, what the ad looked like if I saw it
7  in a newspaper?
8      A   It was two or three sentences. The
9  University of New Mexico and maybe it said
10 Institute of Social Research, I'm not sure, is
11 conducting a study interested in consumers' -- I
12 don't know if it was view, belief, attitudes about
13 financial decisions. If interested, here's the
14 Internet site, something along that line.
15     Q   Okay. Was it in English only?
16     A   To the best of my knowledge, it was in
17 English only.
18     Q   Is there a significant population in
19 New Mexico whose primary language is not English?
20     A   There is a significant population in
21 New Mexico that -- Spanish speaking, correct.
22     Q   Do you know what percentage of the
23 population is Spanish speaking?
24     A   Well, you know, are you talking about
25 Albuquerque? New Mexico as a whole? I can't

Page 85

1  remember the details, but I think we are one of the
2  first minority majority states where we're
3  actually, you know, over 50 percent minority. Now,
4  my guess is that's going to include Hispanic plus
5  Native American, okay? But, yeah, it's a pretty
6  sizable group. And, of course, within that group,
7  you know, many of them will read and speak English.
8      Q   Sure.
9      A   Right.
10     Q   The Native Americans, what's the primary
11 languages that they speak?
12     A   It depends on the tribe. So Navajo
13 tribe, they're going to be speaking Navajo.
14     Q   But not English as a primary language?
15     A   Well, it depends who you're talking
16 about, you know, what generation, what education
17 level, yeah.
18     Q   But as far as you can tell today, the ad
19 was in English only, and it was in four or five
20 major cities at the largest newspapers in those
21 four or five major cities, and those newspapers are
22 in English only?
23     A   That's the best of my recollection.
24     Q   That's what I thought. How long did the
25 ads run?

22 (Pages 82 to 85)

Page 94

1    data and how many respondents and so forth.
2       Q    Well, we already talked about the
3    conversations you had, the initiation of the
4    engagement, we led up to the time where you're
5    going to sort of turn it over to the institute. I
6    think we also talked about discussions on billing,
7    which I'm not particularly interested in, but it's
8    relevant. Is there anything else about the billing
9    that you remember talking to Bill Keller about?
10      A    No. The only thing I remember is
11   expressing some concern that, you know, I wasn't
12   getting paid and Bill saying, well, I don't know,
13   it's, you know, the end of the fiscal year and
14   blah, blah, blah, so whatever.
15      Q    And so the next phase that I think we
16   talked about is then the institute doing its work
17   and coming back with results. Do you remember any
18   conversation with Bill during that phase?
19      A    I don't.
20      Q    How about with Karen?
21      A    I can't remember any discussion.
22      Q    Do you remember any e-mail exchanges with
23   them during this period that we're speaking about?
24      A    No, I don't remember.
25      Q    What's the next thing you do remember as

Page 95

1    far as your communications with Bill? It must have
2    been at some point around the time that the results
3    came in or thereafter, right?
4       A    Yeah, well, my best recollection of the
5    events is that when the data came in and it was
6    turned over to me, then I did the analysis, I did
7    the statistical analysis of the data. And I'm sure
8    I reported some findings at that point to Bill, and
9    then I wrote up this preliminary report that you
10   have a copy of. I think it's dated in
11   December 2008.
12      Q    What I'd like to do is mark -- I think I
13   gave these already -- off the record.
14           (Discussion held off the record.)
15           (Exhibits 3 and 4 marked.)
16      Q    I'm going to show you what we've marked
17   as Exhibits 3 and 4. I showed you these before we
18   started today. Do you recognize that?
19      A    I do.
20      Q    And Exhibit 3, can you tell me what that
21   is?
22      A    That's the report that I wrote up in 2008
23   after we collected the data and I analyzed the
24   data. And so I wanted to write something up, you
25   know, a little bit more formally for Bill. And so

Page 96

1    I wrote this up and submitted it to him.
2       Q    Okay. And then Exhibit 4 is the article?
3       A    That's correct. It's the copy of the
4    published article.
5       Q    And that's, I guess, what has been
6    disclosed as the opinions for today?
7            MS. COMBS: Correct.
8       Q    (By Mr. Schultz) Before I ask specific
9    questions about that, I just want to -- maybe you
10   could kind of lead me up to the drafting of the '08
11   report. I guess it's a report really.
12      A    Uh-huh.
13      Q    It's not an article, correct?
14      A    It's not a published article, no. A
15   manuscript would be a --
16      Q    Manuscript.
17      A    Yeah.
18      Q    What's the best term for that? It seemed
19   to me it was a report.
20      A    A report. Yeah, I like that. A report
21   is good.
22      Q    So the data came in. In what form was it
23   provided to you?
24      A    Either an SPSS file or an Excel file.
25   I'm thinking it was submitted in an SPSS file or --

Page 97

1    I just can't be for sure on that.
2       Q    Did anybody help you analyze it?
3       A    No. I analyzed the data myself.
4       Q    And when you say you analyzed the data,
5    could you tell us what it is you did in this
6    process of analyzing it?
7       A    Well, there are really two things. One
8    is to generate some descriptive statistics of the
9    sort that exist within tables. These are the
10   frequency of responses. And then the second part
11   is to carry out what are called inferential tests
12   on the data. So in this case we did chi-square
13   tests, and that's to determine the statistical
14   significance of any differences that might exist.
15      Q    Let's back up a little bit. You said
16   chi-square test.
17      A    Greek letter chi. C-H-I dash S-Q-U-A-R-E
18   is the literal way of writing it.
19      Q    For our transcript, would it be best to
20   have it that way or would it be --
21      A    If you can't do the Greek letter, I would
22   write it C-H-I dash S-Q-U-A-R-E.
23      Q    How long did that aspect of the job take?
24      A    Analyzing the data?
25      Q    Right.

25 (Pages 94 to 97)

Page 106

1  consumers' decisions. The null hypothesis is that
2  it would not.
3      Q    Did Bill Keller have part of the -- did
4  he help provide you with the assumptions or the
5  hypotheses?
6      A    Well, I mean, that's something that I
7  would have crafted. He was not involved in that.
8      Q    Okay. So what I'd like to do -- you can
9  push that aside.
10     A    Okay.
11     Q    So what I did with Exhibit 3 is just try
12 to put in brackets stuff that didn't make its way
13 into Exhibit 4.
14     A    Okay.
15     Q    And there wasn't much.
16     A    Okay.
17     Q    And then with Exhibit 4 I underlined what
18 was in your report that made its way into the
19 article.
20     A    Okay.
21     Q    And it looks like most of it.
22     A    Okay. All right.
23     Q    So I explained it to you earlier,
24 correct, that that's what I did, right?
25     A    Correct.

Page 107

1      Q    And you had a chance to look at it
2  earlier, and you can look at it again now if you'd
3  like. Okay?
4      A    Okay.
5      Q    And I don't think there is much startling
6  with the stuff you took out, but I'm just going to
7  ask you. In the first paragraph you took out that
8  bracketed sentence at the end. Is that important
9  for some reason?
10     A    Well, let me back up.
11     Q    Sure.
12     A    When you say I took out, it's not clear
13 to me that I did take it out.
14     Q    Okay.
15     A    It might have been some editing that
16 Nathalie provided, okay? So it might be helpful if
17 I state just what happened.
18     Q    Sure. Go ahead.
19     A    And I think it's clear in the e-mails
20 that maybe she provided or I provided. So I sat on
21 this for a couple of years not really sure --
22 knowing what to do with it. And it wasn't much of
23 a burning issue for me, to be honest. But as we
24 all know, one of the things we're supposed to do is
25 publish on the job, and so I thought, well -- and I

Page 108

1  had no connection with the law school at all. I've
2  done work with people in the medical school but
3  never in the law school. And I thought, I'll just
4  get on the Internet and poke around and see if
5  there's someone over there that might have some
6  interest in this. And I found Nathalie --
7  Nathalie's website and looked at a little bit of
8  her research description, and it looked like she
9  was interested in some empirical data.
10          So I contacted her, and I can't
11 remember whether I sent this in that first e-mail or
12 whether it was a later e-mail. Probably I didn't.
13 I just said, look, I've got this project, I've been
14 working on it. Do you have any interest in looking
15 at it to see if it might have some possibility for
16 publication in the law side? And she said yes and
17 did. And so then, you know, at some point I gave
18 her this report.
19          MS. COMBS: Exhibit 3.
20          THE WITNESS: Exhibit 3. And then she
21 put together a -- an initial draft of this
22 including that.
23          MS. COMBS: And you're referring to
24 Exhibit 4.
25          THE WITNESS: Correct. Okay. And, you

Page 109

1  know, now we're working as co-authors on this
2  manuscript. And so there's kind of a joint effort
3  and, you know, my guess is that she didn't do much
4  with this part but, you know --
5          MS. COMBS: You're referring to Exhibit
6  3.
7          THE WITNESS: Exhibit 3, but she might
8  have thought, well, that's not going to really be
9  meaningful to the audience who reads this journal,
10 so she might have taken that particular sentence
11 out. So that's my point, is that it's going to be
12 difficult for me to say that I removed this at this
13 point in time.
14     Q    (By Mr. Schultz) Right. Now, we're
15 talking about something that happened a little over
16 three years ago.
17     A    2010, I recall, is when we started having
18 our interactions.
19     Q    Well, I'm going to ask the questions
20 anyhow. And based on what you just said, you're
21 going to say, I don't remember.
22     A    Okay.
23     Q    But that's okay. So -- and it's only a
24 couple -- it's only a few. On the first page, do
25 you remember who took out that last sentence in the

Page 114

1    A    When you talk about random selection,
2  people use that term differently, and some people
3  use it loosely.  And so there might be some folks
4  who would say, well, yeah, the selection was random
5  too because what you did was put out these ads and
6  whoever wanted to respond, but that's not true
7  random selection, okay?  I agree.
8    Q    So that should probably not be in the
9  article?
10   A    That particular word probably should not
11 be in the article in that particular location.
12   Q    In a previous sentence of the article, do
13 you see they added "significant to demographic
14 characteristics"?
15   A    In the previous sentence here, "Of
16 particular interest was whether the two groups of
17 participants assigned to Survey A and Survey B
18 differed along the lines of any significant
19 demographic characteristics."  Well, that's fine.
20 I mean, what we are talking about there when we use
21 the word "significant" is statistically
22 significant, okay?
23   Q    Who added that?
24   A    Where is the original?
25   Q    It's the same sentence --

Page 115

1    A    Oh, right up above it?
2    Q    It's just the prior sentence to the one
3  we were talking about.
4    A    Yeah, I'm not sure.
5    Q    That seems like a substantive change to
6  me, though, adding a significant demographic.
7    A    I don't have a problem with that so much
8  because we did test the statistical significance of
9  the two groups, okay?
10   Q    So there's no difference between
11 significant demographic characteristics and
12 demographic characteristics?
13   A    Well, the word -- the added word
14 "significant" is appropriate there, okay, is what
15 I'm saying.  That's fine.  That's not a problem.
16   Q    Okay.  Take the next page, 4 of Exhibit
17 3.  So could you -- I'm sorry, on the bottom of
18 page 3 you have on Exhibit 3, "These results
19 further corroborate the finding that actually
20 knowing" --
21   A    I'm not finding --
22   Q    On the bottom of page 3.
23       MS. COMBS:  Here and --
24   Q    No, bottom of page 3.  Right here.
25   A    Okay.  There we go.

Page 116

1    Q    Let's start over.  On the bottom of page
2  3 it reads, "These results further corroborate the
3  finding that actually knowing the critical
4  information about a debt repayment decision can
5  influence a decision maker's choice of a debt
6  repayment action."  Right?
7    A    Correct.
8    Q    So now go to page 379, it goes onto page
9  380 of the report, and it reads the following,
10 "These results further corroborate the finding that
11 actually knowing the critical information about a
12 debt repayment decision does indeed influence a
13 decision maker's choice of a debt repayment
14 action."
15   A    Correct.
16   Q    So what we've seen is originally it said
17 it can impact the decision, and later it was
18 changed to it does indeed influence a decision.
19   A    Correct.
20   Q    You didn't make that change, did you?
21   A    I probably did make that change.
22   Q    You did?
23   A    Yes.
24   Q    So is there a difference between can
25 influence and does indeed influence?

Page 117

1    A    There is, yeah, and clearly this is a
2  stronger statement.  But it's this statement
3  that --
4        MS. COMBS:  And you're referring to "can
5  indeed."
6        THE WITNESS:  "Can indeed" in the
7  original -- in the manuscript, that better reflects
8  the results of the study.  Okay?  So when I wrote
9  "can" in the first case under Exhibit 3, that's
10 true, but it wasn't as strong as it could have
11 been, okay?  It was a little more tentative there.
12   Q    (By Mr. Schultz) That's a big difference
13 in strength.
14   A    It's a huge difference in strength, I
15 agree a hundred percent, and I think that's part of
16 the power of this particular study.
17   Q    So when you were engaged by the State of
18 New Mexico to assist its attorney general in
19 pending litigation, you used the term "can
20 influence."  Yet when you decided to publish an
21 article two years later, you changed it to "it does
22 indeed."  That's a pretty big change, right?
23   A    I think it's a big change.
24   Q    And nothing happened in the interim
25 between 2008 and 2010.  The data is all the same?

30  (Pages 114 to 117)

Page 118

1    A    Correct.
2    Q    But you think that was your conscious
3 decision, not somebody else's?
4    A    Well, what I think is that in writing the
5 initial report, I did not state the conclusions of
6 the study as strongly as I should have.  Okay?
7 So --
8    Q    Do you remember making that change?
9    A    I don't remember making that change.
10   Q    I'm going to show you a whole bunch of
11 drafts, and I can tell you it doesn't point to you.
12   A    It doesn't point to me?
13   Q    No.  To the best of my recollection, it
14 doesn't.
15   A    Okay.
16   Q    Do you remember making that change?
17   A    I can't remember making that specific
18 change.  You know, in these editing processes,
19 manuscripts go back and forth.  What I can say is
20 that I'm comfortable with that particular statement
21 that we make in the final manuscript.  Okay?
22   Q    Okay.  We'll get back to that.  On page 5
23 of your Exhibit 3, you'll see there is a sentence,
24 "Those participants who were told that the debt
25 could not be enforced through court action were

Page 119

1 more likely to choose to decline to pay the debt
2 than participants who were not told about the
3 time-barred debt."  Right?
4    A    Right.
5    Q    And if you go to page 380 of Exhibit 4
6 under "conclusion," second sentence, it says,
7 "Those participants who were told that the debt
8 could not be enforced through court action chose
9 different repayment options."
10   A    Correct, yeah.  Both of those are --
11   Q    Okay.  So on the one hand it added
12 somehow this "chose different repayment actions" as
13 opposed to "declined to pay."  That's a big
14 difference as well, right?
15   A    Well, both are true.  Both are reflected
16 in the data.  It is indeed the case that they chose
17 different repayment options.  More specifically,
18 it's indeed the case that those participants who
19 were not told were more likely to decline the
20 payment.  So one refers to the proportion of
21 participants choosing a particular option, decline
22 to pay.  This just talks more generally about
23 differences in selecting the options.
24   Q    Okay.
25   A    You know, I mean, both are accurate, both

Page 120

1 reflect the data.  This seems to be a little bit
2 more general statement --
3         MS. COMBS:  Referring to Exhibit 4,
4 correct?
5         THE WITNESS:  Yes, Exhibit 4.
6    Q    (By Mr. Schultz) Take a look at just
7 Exhibit 4 for a moment.
8    A    Okay.
9    Q    The pages 372 up until 377, that was not
10 prepared by you, as far as I can tell.
11   A    Yeah, I think that was Nathalie's work in
12 setting the context for the study and putting it
13 within kind of a legal, you know, context.
14   Q    You didn't edit her -- I'll say the first
15 five pages, right?
16   A    Well, I went through everything and if I,
17 you know, thought some edits -- minor editorial
18 changes sounded better, I would certainly make
19 those and submit it back to her as -- but I didn't
20 edit anything of substance, you know, well, you
21 shouldn't have cited that case, you know.  So yeah.
22   Q    Other than perhaps some grammatical
23 changes though --
24   A    Right.
25   Q    The first, I guess, five pages is pretty

Page 121

1 much Nathalie's writing?
2    A    I think that's true.  This part here
3 under 3, page 373, 3, "the study," yeah, I'm not
4 sure if she wrote that or if I wrote that.  But,
5 yeah, you're correct, most of what's there is from
6 Nathalie Martin.
7    Q    I just don't want to ask you questions
8 about it, so I'm just asking, you're not taking
9 ownership of that?
10   A    No, I didn't write that.
11   Q    And all those footnotes, those 57
12 footnotes you're not taking --
13   A    Well, I remember spending some time
14 looking at those footnotes and noticing that they
15 were out of alignment and correcting some things,
16 but, yeah, it was minor editorial stuff.
17   Q    Right.  I saw in e-mails you commented on
18 the footnoting.
19   A    Yeah.
20   Q    But not in substance.
21   A    Correct.
22   Q    Because I really don't want to ask you a
23 lot of questions about it if it has really not much
24 to do with that.
25   A    That's correct.

31 (Pages 118 to 121)

Page 146

1    hopefully, have A and B fairly close in that
2    certain demographic information.
3        A    Correct.
4        Q    Would you agree that it's fairly
5    significant that it overrepresents women?
6        A    There is certainly a larger proportion of
7    males in the state of New Mexico than I think we're
8    representing -- that we're seeing represented here
9    in these data. So, yes, more females responded
10   proportionally than males to this particular
11   survey.
12       Q    What is the New Mexico difference between
13   females and males percentagewise?
14       A    I don't know that right off the top of my
15   head, but I guess it would be pretty close to
16   50/50.
17       Q    It also -- well, you tell me. It seems
18   like it has a significant overrepresentation of
19   fairly educated people, at least compared to the
20   state of New Mexico.
21       A    Yeah, it could be. There are -- what are
22   we looking at? Roughly 30 percent with less than a
23   bachelor's degree.
24       Q    I thought it was less than that.
25       A    Well, I'm looking at column 5. So 25 to

Page 147

1    30 percent with less than a -- with some college or
2    less, 34 -- so I suspect you're correct, that this
3    is a little bit higher educated group than what one
4    would find in the general population of New Mexico.
5        Q    I don't want to have to spend a lot of
6    time trying to figure this out, so I'm going to ask
7    you, what is a more accurate representation of the
8    education levels of the people in New Mexico? Can
9    you give us some kind of estimate on that?
10       A    I'm sorry, I'm not going to be able to
11   come up with very specific values there. Yeah, I
12   really can't say what -- like a mean years of
13   schooling would be in the state of New Mexico.
14       Q    Well, maybe -- how about this. Right now
15   the survey has about 70 percent of the people with
16   a college degree or better.
17       A    Yeah.
18       Q    And I've got to believe in the great
19   state of New Mexico that the percentage is probably
20   the other way around, more like 30 percent?
21       A    Yeah, but you'd be surprised. At one
22   time Los Alamos had the highest percentage of
23   Ph.D.s of any city in the country.
24       Q    How many Ph.D.s did they have, a couple
25   hundred?

Page 148

1        A    What's that?
2        Q    How many Ph.D.s are we talking about? A
3    few thousand?
4        A    I don't know how many. We have Sandia
5    Labs, we have Kirtland Air Force base, we have
6    University of New Mexico. I think what you would
7    find in New Mexico is a huge discrepancy, you know,
8    very educated people and then a large number of
9    very poorly educated people. But I'm not
10   disagreeing with your point that this is probably a
11   higher education than what one would find across
12   the population of New Mexico.
13       Q    And I don't want to beat this anymore, I
14   kind of think you know this a lot better than I
15   would, but it would seem to me that even in
16   New Mexico that probably the people with a college
17   degree and post-college degree educations is more
18   like 30 percent instead of 70 percent. Do you
19   think that's accurate?
20       A    I wouldn't want to put a percentage on
21   it. I don't know.
22       Q    I could probably get that?
23       A    You probably could.
24       Q    I bet the University of New Mexico has
25   that somewhere?

Page 149

1        A    Somewhere you're going to be able to find
2    that. Probably Google, it will pop right up.
3        Q    I thought you might know it because you
4    do these tests. But you don't?
5        A    I don't know that. I don't know the
6    answer to that question.
7        Q    How about debt ratios? How do you think
8    those are representative for the state of
9    New Mexico?
10       A    Boy, I have no idea. That's just not
11   something that I have ever collected data on. I
12   just don't know.
13       Q    Does it have any particular relevance to
14   you that most of the people didn't have much debt?
15       A    Most of the people did not have much
16   debt?
17       Q    Right.
18       A    And why are you saying that?
19       Q    Well, 67 percent of the people either had
20   no debt or less than $10,000 in debt.
21       A    Yeah, you know, the $10,000 limit, you
22   know, for -- I mean, I don't know how to interpret
23   that, but that seems like a pretty reasonable
24   amount of debt to have. But, again, I don't know
25   how representative these percentages are across the

38  (Pages 146 to 149)

Page 150

```
1    population of New Mexico.
2        Q    Okay.  Well, I guess the last here would
3    be the income.  How do you feel that's -- how do
4    you think that correlates to the people of the
5    state of New Mexico?
6        A    I don't know.  It may be a little bit
7    high, I would suspect so, given the education
8    level.  So those two things, obviously, could vary.
9        Q    Like the debt maybe?
10       A    Perhaps.  But that I'm less certain
11   about.
12       Q    Female --
13       A    It seems like I know a lot of people who
14   have money and a lot of debt.
15       Q    Good point.  I believe I know that you
16   didn't eliminate anybody who responded to the
17   survey, correct?
18       A    Well, there were some people that we
19   eliminated because they failed to answer that
20   critical first question, okay?
21       Q    They stopped after five for some reason?
22       A    Yeah.  And so other than that, we did not
23   eliminate people.
24       Q    Well, the people that stopped after No.
25   5, are those people that were in Survey A and
```

Page 151

```
1    Survey B, or were they entirely in Survey B?
2        A    Good question.
3        Q    I'll give you a clue --
4        A    I don't know.
5        Q    The reason I thought it might be B is
6    just because the disparity between 74 respondents
7    and 63.
8        A    Not necessarily.  That disparity is not
9    unreasonable for a random assignment out of that
10   number of people.  No, I don't think there's any
11   reason to believe that it was just Survey B people
12   who failed to answer the question.  I would be
13   surprised if that were the case.
14       Q    Okay.
15       A    I'm trying to think back to that Excel
16   file and whether those ten people are represented
17   there or not.  I just can't remember.
18       Q    Well, I have it here.  It's awful hard to
19   read when I print it out --
20       A    It is hard to read.
21       Q    -- without looking at the program itself.
22       A    Exactly.
23       Q    Do you have the program, Cathy?
24       MS. COMBS:  You mean here with me?
25       MR. SCHULTZ:  It was hard for me to read
```

Page 152

```
1    it without putting it all along the wall.
2        MS. COMBS:  That's also a problem with
3    me.
4        MR. SCHULTZ:  If you were to send it to
5    me electronically, would I be able to --
6        MS. COMBS:  I think we have it, yes.
7        Q    (By Mr. Schultz) Is that something I would
8    be allowed to see in the format it was?
9        A    Yes.
10       Q    That would make my life a lot easier.
11   I'll show you the printout.  I don't know if that's
12   going to help you at all.
13       A    I don't think it's going to help.
14       Q    So let's not waste your time.  So I also
15   understand that the way you came up with this 74
16   respondents for A and 63 respondents for B, is that
17   you ran the ad for a certain determinate amount of
18   time, and that's how many people responded.
19       A    Correct.
20       Q    Do you know, was it a situation where
21   they just ran out of the people answering it or
22   they just decided to stop taking people?
23       A    I don't think it was a matter of stopping
24   taking people.  My best recollection of that is you
25   kind of look -- and this is the Institute of Social
```

Page 153

```
1    Research doing this.  I wasn't involved in this.
2    You look at response rate and, you know, when these
3    ads first go out, maybe within a few days you get
4    quite a few and then it kind of maxes out and then
5    it begins to kind of trickle down and after a while
6    you're getting, you know, one person every couple
7    of days.  At some point, when it looks like it's
8    petering out, you cut it off.
9        Q    Was there any determination by you or the
10   institute that 147 respondents was sufficient?
11       A    No.
12       Q    Any concern that it was too small?
13       A    No.  The question of too small is almost
14   always a statistical question, and so is it too
15   small -- is the power of your test too small.  You
16   know, do you need a larger sample size for that
17   reason.  I got the data, analyzed it.  The effect
18   was extremely strong and, I mean, there would be no
19   reason to gather more people for the survey.
20       Q    I think earlier you said that you hadn't
21   done a survey like this with an ad and the Internet
22   before, right?
23       A    That's correct.
24       Q    Any other types of surveys or projects
25   that resulted in your publications where typically
```

39 (Pages 150 to 153)

Page 166

1  regardless, it is boldfaced.
2      Q    As the academic in the whole group, I
3  guess you didn't want to have any boldfaced?
4      A    You know what? I can't remember how I
5  ended up. I do remember wondering whether it was a
6  good idea initially. I guess it's starting to come
7  back. I think part of the argument was if you look
8  at a lot of these letters that go out, I don't know
9  if all the information, but a lot of it is
10 boldfaced, some of it's not boldfaced and, you
11 know, the final consensus and, this was probably
12 the Institute of Social Research people and maybe
13 Bill Keller and myself sitting down and discussing
14 this. The bottom line is that it was boldfaced,
15 okay?
16     Q    So question 6A was in boldface, and that
17 was the only part of any question that was
18 boldfaced, is that correct?
19     A    That's correct.
20     Q    And you would agree that would obviously
21 draw the attention of anybody who's reading it more
22 so than anything else?
23     A    Perhaps.
24     Q    Okay. I just can't imagine being the
25 academic in this group that that's what you wanted,

Page 167

1  to have that question boldfaced. You must have
2  been arguing against it, right?
3      A    I don't know if I was arguing against it.
4  As I just said -- let me restate it -- is that I
5  raised the question. There were some
6  counterarguments made that indeed it does make
7  sense to put this in boldface, okay?
8      Q    The only counterargument that you
9  articulated that you can remember, obviously, five
10 years later is that there's boldface in some
11 letters.
12     A    Right.
13     Q    You're not trying to equate the boldface
14 in an Internet survey to the boldface in a
15 collection letter.
16     A    Yeah, but let me see if I can make a
17 counterargument now. I mean, that is the critical
18 piece of information. That is the very reason for
19 doing this study this way. So, you know, you know
20 this information is here. Is it relevant, okay?
21 Now, is that going to influence the decision you
22 make versus it's not, okay?
23         So it really wasn't a question. I
24 mean, you could argue it this way: If someone
25 missed that information, if they didn't read that

Page 168

1  sentence, well, now the two groups are the same.
2  Kind of regardless of whether it was boldfaced or
3  red letters or whatever, we wanted the people in
4  group A to read that sentence and to understand it.
5      Q    And it was kind of like shouting at them,
6  though, wasn't it? It was like shouting at them,
7  look at this and pay particular attention to it,
8  wasn't it?
9      A    Well, I don't know how you interpret
10 boldface, whether it's shouting or not. Again, a
11 lot of the letters or some of the letters
12 apparently had boldface information in the report,
13 so this wasn't all that unusual.
14     Q    Come on --
15     A    So based on what you know about this
16 situation, which of the following actions would you
17 most likely choose, okay? So that's the final
18 question asked in -- you know, before they make the
19 choice.
20     Q    Bill Keller was a proponent of that,
21 right?
22     A    I can't say for sure who was in favor,
23 who was against, and whether Bill was or not. I
24 really don't know, honestly.
25     Q    Well, who was against it?

Page 169

1      A    Like I said, there were other people from
2  the Institute of Social Research involved in this.
3  I can't recollect at this point in time the kind of
4  sequence of events that led to the inclusion of it
5  in boldface.
6      Q    Were these open-ended or closed-end
7  questions?
8      A    Well, they're right here, so these are
9  closed-end questions.
10     Q    And when we're talking about these and
11 this, we're all talking about Exhibit 4, which has
12 the report which has the questions at the end,
13 correct?
14         MS. COMBS: On page 381.
15     Q    (By Mr. Schultz) 381?
16     A    Correct.
17     Q    Would there be a way to do this in an
18 open-ended question?
19     A    Probably, but I don't think that would
20 have been a preferable way of collecting these data
21 and doing the study. In general, there's more
22 subjectivity involved in doing surveys with
23 open-ended questions than closed-end questions.
24 You know, once you get those open-ended questions,
25 then you've got to interpret them. Well, did they

43 (Pages 166 to 169)

Page 190

```
 1      A   We could have put a whole host of options
 2  there, correct.  We could have added options, if
 3  that's what you're asking.
 4      Q   All right.  And isn't an "I don't know" a
 5  reasonable option for 6A?
 6      A   I don't think it's reasonable.  In a
 7  question of this sort, you're asking people which
 8  would you most likely choose, okay?  That's how
 9  it's stated there at the very end.  And so, you
10  know, we're often asked, you know, those sorts of
11  questions in real life.  This is a reasonable kind
12  of question to ask, which would you most likely
13  choose.  We get that information from your health
14  plan or whatever, you're asking questions like
15  that.
16      Q   But if you had "I don't know," it seems
17  like some people could have said reasonably in
18  response to this question, which is kind of a
19  technical question, "I don't know."
20      A   Or "I don't care" --
21          MS. COMBS:  Or no answer.
22      A   "I don't believe you" or no answer or "I
23  refuse to answer."  You could put a whole host of
24  alternatives there.
25      Q   But "I don't know" is a reasonable one
```

Page 191

```
 1  because it seems like ten people didn't answer
 2  these questions and maybe it's because they didn't
 3  know how to answer it, right?
 4      A   Again, we speculated earlier about why
 5  people did not answer.  I have no idea why people
 6  didn't answer.  What I can say is that this is not
 7  uncommon for the sorts of surveys that are commonly
 8  done, that you give people a set of alternatives
 9  and ask them to make a choice among them.
10      Q   Well, it's just as common, I'm sure, to
11  say, you've got the option of "all of the above" or
12  "I don't know" or "more information needed," right?
13      A   I'm not so sure, yeah.  It would depend
14  on the context.
15      Q   Why was it important to have options A,
16  B, and C for questions 6 and 8?
17      A   Those were -- we attempted to model the
18  sorts of letters that are put out by these debt
19  collection agencies.  Those were intended to be
20  representative of the sorts of responses that one
21  sees.
22      Q   Couldn't a person say, well, I can't do
23  A, B or C.  I could do something else?
24      A   Yeah.  And I kind of wondered that myself
25  when I read a couple of those letters, why the debt
```

Page 192

```
 1  collection companies didn't give them some more
 2  options.  But I guess that's the way it's done.
 3      Q   What if I told you that's not the way
 4  it's done?
 5      A   Okay.  How is it --
 6      Q   You're an empiricist?
 7      A   An empiricist.
 8      Q   You can't possibly be saying because you
 9  saw one collection agency's letters you're going to
10  assume that somehow that's how others do it.
11          MS. COMBS:  Again, you're assuming he
12  only saw one debt collection agency's letters, and
13  he said three.
14          MR. SCHULTZ:  He said two or three
15  letters.
16          THE WITNESS:  Yeah.
17      Q   (By Mr. Schultz) You have no idea what
18  other agencies do as far as their letters.  That's
19  correct --
20      A   Beyond the ones that I saw?
21      Q   The two, maybe three that you saw for
22  Merchants' and maybe somebody else, but you think
23  it was Merchants'?
24      A   Right.  You're saying beyond those, I
25  don't know?
```

Page 193

```
 1      Q   Yeah.
 2      A   Yeah, I don't know what other debt
 3  collection agencies do.  That's not my area or
 4  interest or area of expertise.
 5      Q   Let's assume that nobody else besides
 6  Merchants' has these options in these letters.
 7          MS. COMBS:  Again, you're making up facts
 8  out of the sky, David.  So why do you want --
 9  what's the point of it?  Objection to form.
10      Q   (By Mr. Schultz) You're trying to
11  extrapolate somehow that other agencies do it this
12  way, it seems like.
13      A   Well, these options, obviously, were from
14  Bill Keller somewhat, maybe Bill in connection with
15  Karen.  But you're right, this isn't something --
16  you know, I didn't decide that these are -- we're
17  going to say 30 percent and 50 percent and make
18  monthly payments.  Again, I think our goal, as I
19  understood it, was to make these options realistic
20  and representative of the sorts of alternatives
21  that are given to consumers.
22      Q   By Merchants' Credit Guide only.
23      A   Well, representative by definition goes
24  beyond just one other case.  It's going to be
25  representative of whatever, whoever's out there.
```

Page 194

1    Q    You're not saying this is representative
2 of other people's collection letters, though.
3    A    I'm saying that my understanding of why
4 these alternatives were chosen was to be
5 representative --
6    Q    Okay. I got you.
7    A    Yes. We wanted this to be general, not,
8 you know, highly specific to a particular case.
9    Q    So go back to the page 379. So these are
10 your results of the questions 6A, 7A -- I'm sorry,
11 6A, 6B, 7A, 7B, 8A, 8B, right?
12    A    Yes, 6, 7, and 8, and then you've got
13 your A and B versions.
14    Q    Do the responses vary depending on how
15 much they said they could afford to pay with these
16 options?
17    A    Boy, that's a good question, and I don't
18 know the answer to that question. I don't know.
19    Q    Did the answers vary depending on whether
20 it was a female or male?
21    A    Yeah, I don't know. You're right, one
22 could go in and look at the data in more detail,
23 okay, and ask -- and kind of split this out along
24 different demographics. I'm trying to remember, to
25 the best of my ability, whether I did any of that,

Page 195

1 and I just can't remember doing it. I don't think
2 it was of particular interest to Bill Keller at
3 that point in time. This seemed to be the major --
4 you know, we kind of got the major question
5 answered. But you're right, you could go in and
6 look at that.
7    Q    So the statistical significance, I think
8 you refer to it, is that in the decline to pay from
9 34 in A and 6 in B, is that it?
10    A    Correct. 34 percent versus 6 percent.
11    Q    And what do you attribute that difference
12 to?
13    A    Well, I think the only thing that we can
14 attribute it to is the presence of the critical
15 sentence.
16    Q    How come the second part of that had
17 27 percent and 56 percent?
18    A    Why does the one-time payment have those
19 particular proportions?
20    Q    Right.
21    A    I'm not sure I understand the question, I
22 mean, other than to say that it was that proportion
23 of people who chose that response.
24    Q    Well, I thought that they would match up.
25 You know, they did here with 50 percent, 8 percent,

Page 196

1 and 6 percent said that, right?
2    A    I'm not following you. I'm sorry.
3    Q    The response to 6A and 6B in regards to
4 making a 50 percent monthly payment was about the
5 same, right?
6    A    Okay. I see approximately the same
7 percentage there, right.
8    Q    And then go above that just a little bit
9 and monthly payment, payment in full were about the
10 same too, right?
11    A    Right.
12    Q    Okay. Is that important to you?
13    A    I don't know what to make of that other
14 than that's the way the data came out. Those are
15 the proportions that we saw there.
16    Q    Can you draw any conclusions from that?
17    A    I'm not sure what you're getting at
18 there.
19    Q    It's your numbers, and I thought it was
20 interesting that they matched up for those two
21 parts.
22    A    Okay. Right.
23    Q    I'm just wondering if it was interesting
24 to you.
25    A    Yeah. Well, for me I was kind of more

Page 197

1 interested in any differences that occurred rather
2 than any similarities.
3    Q    Okay. Well --
4    A    And so that was the focus, okay? So,
5 yeah, you're right, for those particular options,
6 the two groups didn't differ too much, at least at
7 face value here. But we see more radical
8 differences for the one-time payment and the
9 decline to pay options.
10    Q    Yeah, what do you make of that one-time
11 payment, for 6A it's only 27 percent said they'd
12 make a one-time payment and yet for 6B 56 percent
13 say it.
14    A    Well, part of that proportion went up
15 into that decline to pay. If you're wondering
16 where the rest of that group went, that's where
17 those guys ended up. That accounts for the
18 34 percent versus the 6.
19    Q    Well, if they were given another option
20 like "I don't know," wouldn't a lot of those people
21 fall into that category perhaps?
22    A    I have no idea. You would have to do the
23 study and collect the data.
24    Q    But isn't it interesting, though, that
25 the difference fell into the one-time payment

Page 206

1      Q    And then when you ask whether it's
2   important, 30 percent of the people just say it
3   wasn't important --
4          MS. COMBS:  30 percent in Survey B.
5          MR. SCHULTZ:  Cathy, please.
6          MS. COMBS:  Well, just be clear.  In
7   Survey A they said something different.  So be
8   clear.  Object to the form.
9          MR. SCHULTZ:  Well, just do that.  We're
10   trying to get done here now.
11      Q    (By Mr. Schultz) Thirty percent -- so
12   you're saying there is a 20 percent differential
13   between the two, and that's important to you, it's
14   material in your mind.  And I'm saying 30 percent
15   of the people didn't even think it was important.
16      A    No, what I'm saying is that the
17   difference in response rates is not important, in
18   my mind.  That's irrelevant.  What's critical is
19   that was there a statistically significant
20   difference between the responses of those two
21   groups, and the answer is absolutely yes.
22      Q    And it's important?
23      A    Very important.
24      Q    All right.  And so when I asked you about
25   the next one, one-time payment, saying, gee,

Page 207

1   27 percent and in 6B 56 percent, it didn't seem to
2   matter that much to you.  And when I asked you
3   about the difference between 55 and 30, it didn't
4   seem to matter that much.  Those seem like pretty
5   big differences.
6      A    Well, what's important is, you know, not
7   what matters to me or not, but what's important is
8   whether the numbers differ statistically, okay?
9   So, you know, whenever you do a randomized
10   controlled study, you know, and you go out and you
11   randomly assign your subjects to conditions, you
12   get your data, you look at the data, what are the
13   differences, okay?  You know, that's what we're
14   doing here.
15      Q    Here 45 percent of people said in 6B that
16   that big caps thing wasn't important.  That's a lot
17   of people, right?
18      A    Relative to what?  I think the question,
19   as I understand it more from the legal perspective
20   is, is this information material, is it important
21   in making their decision, okay?  And you've got
22   55 percent saying, yeah, I believe it is important,
23   okay?  I saw the material, I believe it's
24   important.  But more importantly, their behavior
25   changed in the selection of these options, as we

Page 208

1   see in question 6.  So as we say in the write-up,
2   that's really the critical thing, okay?  Why did we
3   ask these two follow-up questions.  Just you know,
4   you've got the people.  It's a very short survey,
5   it just takes them a few minutes to do this, why
6   not ask them a couple more questions.
7      Q    What you just said -- I'm sorry.
8      A    None of this, however -- I think this is
9   an important methodological point.  These were
10   sequential questions and after responding to one,
11   it went away.  They did not have a chance to go
12   back and revisit their answers to this one.  So we
13   could have asked them that first question and
14   stopped.  That was the critical question.
15      Q    Is sounds like this 7 and 8 weren't
16   really important at all to you.
17      A    Well, they're there.  They're part of the
18   paper, they're part of the data that we collected.
19   We reported the data that we collected.  We
20   reported all the data that we collected.  I think
21   in terms of importance, you're right, that they're
22   not as important as this first question.
23      Q    Under 6B, which I thought it was a pretty
24   important question, almost 60 percent say it didn't
25   matter, it wasn't important.  And 11 percent, for

Page 209

1   all we know -- we don't know what they would have
2   said --
3      A    Are you talking about question 6?
4      Q    7B.
5      A    Okay.  7B.
6      Q    Yeah.  You've got almost 60 percent, and
7   then 11 percent not even answering.  It could be
8   70 percent of the people, for all we know, just
9   didn't think it was important.  We don't know.  How
10   about --
11          MS. COMBS:  Is this a question or is this
12   an argument or what?  Are you asking him a
13   question?  I'm going to object on the basis it
14   calls for speculation.
15      Q    (By Mr. Schultz) That seems -- the
16   question is, that seems pretty important to me that
17   almost 60 and perhaps 70, for all we know, people
18   didn't think it was important.  That doesn't matter
19   or does it matter?
20      A    To what question?  Does it matter to what
21   issue?
22      Q    Well you're talking about materiality,
23   right?
24      A    Right.
25      Q    And 60 or maybe 70 percent of the people

McCORKLE LITIGATION SERVICES
CHICAGO, ILLINOIS 312-263-0052

Page 214

1 if they were told about this lawsuit enforcement
2 thing yet 49 or 43 percent say they wouldn't pay if
3 they were told about the credit report seems to
4 make the credit report pretty important. Is that
5 right?
6     A    So are you asking about 49 versus 43?
7     Q    No, just 49 or 43, for that matter.
8 Those are pretty high numbers.
9     A    Yeah, those are high numbers, let's say.
10     Q    These are your questions. I'm just
11 asking about the results of your questions. It
12 seems to me what you're showing here, and that's
13 what I thought you were trying to show with your
14 questions, is that if it impacts their credit,
15 that's a pretty big factor in deciding whether to
16 pay.
17     A    That was not a major question or issue in
18 the design of the study. Questions 7 and 8 were
19 sort of like, okay, let's ask a couple more
20 questions. From my perspective, and I know I've
21 said this before but I'll say it again, the
22 critical question is question 6.
23     Q    Well, this also -- your report and study
24 could also be demonstrating the, I suppose, not
25 surprising result that telling somebody about the

Page 215

1 impact or not impact on their credit report is
2 important, right?
3     A    Well, whether it's surprising or not,
4 apparently no one else had collected empirical data
5 that bore upon the issue. So apparently it's
6 important to have that sort of data.
7     Q    And that demonstrates to me, at least
8 your question and the responses that you put in
9 your report, shows that telling them about credit
10 reporting is important.
11     A    I'm not talking about credit reporting --
12     Q    Or lack of credit reporting, for that
13 matter.
14     A    No, I'm not talking about that either.
15 I'm talking about the presence of the material
16 question. That's important. Okay? And that's the
17 focus of the paper, that's the focus of the
18 statistical analysis. That's really the focus of
19 our conclusions. I'm not sure we even say much
20 about questions 7 and 8 in the conclusions.
21     Q    You don't. I'm not sure why. There's
22 interesting stuff in there. I don't know why
23 you're arguing about the interesting stuff. I
24 found it interesting.
25     A    That's good.

Page 216

1     Q    But it seems like you're fighting over
2 whether or not the credit reporting aspect was
3 material to these people in deciding whether to pay
4 it. Don't you think it was, based on your test?
5     A    I can't say about the credit report
6 because notice that that's not the critical
7 distinction between Group A and Group B, okay?
8 Notice that 7 and 8 differ for A and B, okay?
9 Because we're now having to speculate and
10 hypothesize and so forth. So there's questions
11 about 7 and 8 and how people are going to really
12 interpret this, how well they're going to say,
13 well, if you did receive this information, okay?
14         But what's clear about 6 is that one
15 group did receive the information and chose options,
16 another group didn't receive the information and
17 chose among those same options, and there were clear
18 statistical differences between those two responses.
19     Q    So I'm slightly flabbergasted we're
20 arguing over question 8, but I keep going over
21 question 8. What do you think is important about
22 the fact that well over 40 percent of the people
23 would decline to pay if they were told about the
24 credit reporting aspect? I mean, it has some
25 importance, doesn't it?

Page 217

1     A    So question 8A says, "If you had known
2 that your choice would not affect your credit
3 rating, which of the following actions would you
4 have chosen." Well, are people more likely to
5 decline to pay a debt if they know it's not going
6 affect their credit rating, apparently so.
7     Q    That's what it showed, right?
8     A    That's right.
9     Q    That's what your report showed. You put
10 it in here in your paper.
11     A    And so the point is? So 49 percent of
12 people -- okay.
13     Q    Do you have a control group for this, do
14 you think?
15     A    Well, no, there is no control group in
16 the classic sense of an experimental group and
17 control group. We had two experimental groups.
18     Q    Okay. Your survey does not test whether
19 the words, quote, further collection activity,
20 close quote, in a collection letter imply a threat
21 of litigation, correct?
22     A    Could you repeat the phrase?
23     Q    Sure. Your survey does not test whether
24 the words, quote, further collection activity,
25 close quote, in a collection letter imply a threat

McCORKLE LITIGATION SERVICES
CHICAGO, ILLINOIS 312-263-0052

Page 218

1 of litigation, correct?
2    A    I don't think so. I don't recall that
3 particular phrase --
4    Q    It's not in there.
5    A    It's not in there. Okay.
6    Q    Your survey does not test whether the
7 words, quote, further collection activity in a
8 collection letter represent a threat of litigation,
9 correct?
10    A    Further collection activity, no.
11    Q    Okay. Your survey does not test whether
12 the words, quote, further collection activity,
13 close quote, in a collection letter imply a debt is
14 legally enforceable, correct?
15        MS. COMBS: Can you read that question
16 again?
17    Q    (By Mr. Schultz) I'll read it to you
18 again. Your survey does not test whether the
19 words, quote, further collection activity, close
20 quote, in a collection letter imply a debt is
21 legally enforceable, right?
22    A    The problem I'm having with that question
23 is "imply." You're asking does X imply Y.
24    Q    Right.
25    A    And did we collect data that would answer

Page 219

1 the question, does X imply Y? No.
2    Q    Right.
3    A    I mean, you could probably substitute any
4 X and any Y in there.
5    Q    That's the easy ones. Your survey does
6 not test whether the words, quote, further
7 collection activity in a collection letter
8 represent that a debt is legally enforceable,
9 correct?
10    A    Correct.
11    Q    Your survey does not test whether the
12 words, quote, arrangements for payment, close
13 quote, in a collection letter imply a threat of
14 litigation, correct?
15    A    Arrangements of payment options -- I'm
16 sorry.
17    Q    Your survey does not test whether the
18 words, open quote, arrangements for payment, close
19 quote, in a collection letter imply a threat of
20 litigation, correct?
21    A    I don't think so, no.
22    Q    Your survey does not test whether the
23 words, open quote, arrangements for payment, close
24 quotes, in a collection letter represent a threat
25 of litigation, correct?

Page 220

1        MS. COMBS: Is that not the same question
2 you just asked?
3    Q    (By Mr. Schultz) One's implied, one's
4 represent.
5    A    No.
6    Q    Your survey does not test whether the
7 words, quote, arrangements for payment in a
8 collection letter implies a debt is legally
9 enforceable, correct?
10    A    No.
11    Q    Your survey does not test whether the
12 words, open quote, arrangements for payment in a
13 collection letter represent that a debt is legally
14 enforceable, correct?
15    A    No.
16    Q    Your survey does not test whether the
17 words in a collection letter from -- well, skip
18 that. Strike that.
19        You don't know anything about the
20 difference between an unsophisticated and a least
21 sophisticated consumer, right?
22    A    I do not.
23    Q    You had some e-mails in here real quick.
24        (Exhibit 6 marked.)
25    Q    Showing you what's been marked Exhibit 6,

Page 221

1 it looks like a few e-mails. Go to the second
2 page, please. So the second page has some e-mails,
3 as does the third page, with the Edelman firm.
4 When did they contact you, do you remember?
5    A    I don't remember the exact date. I'm
6 wondering if that first e-mail that I got from
7 Edgar Hernandez is in here. Yeah, I don't see it.
8    Q    Okay.
9    A    Several weeks ago, six weeks ago,
10 something like that.
11    Q    How many conversations have you had with
12 that firm? Don't get into the substance of them.
13 I just want to know how many at this point.
14    A    E-mails or phone conversations?
15    Q    Phone calls.
16    A    Three maybe phone calls. I would think
17 that's about right, yeah.
18    Q    Can you tell me what happened generally?
19 Was it a short call, a long call?
20    A    Well, the initial one was just to kind of
21 introduce the case and what this was all about and
22 your paper -- we found your paper, you know, it's
23 relevant to this case. We would like you to, you
24 know, potentially serve as an expert witness, that
25 sort of thing.

56  (Pages 218 to 221)

Page 222

1     MS. COMBS: Don't say exactly what was
2  said, just the subject --
3     THE WITNESS: I'm sorry.
4     Q    (By Mr. Schultz) I kind of assumed that's
5  what it was.
6     A    Yeah.  And then the next couple of
7  conversations were more about the process of the
8  deposition and -- yeah, yeah.
9     Q    Okay.  The 250 fee, how did you come up
10 with that?
11    A    Well, I think maybe it was little bit of
12 negotiating back and forth.
13    MS. COMBS: Don't say what was said.
14    THE WITNESS: Okay.
15    Q    (By Mr. Schultz) Was that your number or
16 their number?
17    MS. COMBS: Object to that.
18    Q    (By Mr. Schultz) Okay.  We'll do it that
19 way then.  I'm just saying it seems a little unfair
20 that the State gets it for a hundred and you're
21 trying to hit --
22    A    Well, it was five years ago.
23    Q    We've got a ton of e-mails from
24 Nathalie --
25    A    Well, that's not uncommon when you're

Page 223

1  working on a manuscript with someone, there's a lot
2  of back and forth.  Maybe a little bit more than
3  usual, but that's just part of preparing a
4  manuscript for publication.
5     Q    She said her husband helped draft the
6  introduction.  Did you see that?
7     A    I didn't see that she said her husband
8  helped draft the introduction.  I think she said
9  her husband commented on something.  I'm not sure
10 exactly what it was.  I've never met him.
11    Q    Is there a discussion in the e-mails
12 where you thought Bill Keller should be coauthor?
13    A    Well, it was under consideration.  And
14 coauthorship, it's never clear cut, but I thought
15 Bill's contribution to the paper was substantial
16 enough that he should be at least considered for
17 authorship.  And so I asked him whether he would be
18 interested in it.  It would have entailed some work
19 on his part in working on the manuscript, and he
20 declined.
21    (Exhibit 7 marked.)
22    Q    Exhibit 7, which is -- those are
23 Nathalie's e-mails that we got.  I left them in
24 order.  I took out some just because they were
25 redundant.

Page 224

1     A    Right.
2     Q    Go to the page that's marked 6 on the
3  bottom right.
4     A    Okay.
5     Q    You comment here in the middle that you
6  were surprised by the review process because there
7  was no peer review.
8     A    Correct.
9     Q    You understand it's a legal article,
10 though.  They don't necessarily go through that
11 peer review.
12    A    When I was talking about peer review
13 here, I was talking about the more kind of
14 scientific peer review.  It obviously had review
15 and comments from the editor and so forth.
16    Q    But it didn't go through like scientific
17 review, is what you were saying?
18    A    Correct.
19    Q    Go to the next page, page 8.  They use
20 the inartful term of calling the editors apparently
21 dumb-dumbs?
22    A    Where is this?  "What a bunch of
23 dumb-dumbs."  You'd think for an attorney she'd be
24 more careful.
25    Q    She was talking about the editors -- she

Page 225

1  wasn't talking about you.
2     A    I'm not sure who she is referring to
3  here.
4     Q    If you go down the page --
5     A    Yeah.
6     Q    -- she's referring to the editors?
7     A    I don't know if it's the editors.  I
8  think more likely it was one of the staff members
9  at the journal that she had some contact with that
10 was less than professional or desirable or
11 whatever.
12    Q    Go to page 11.  What's SSRN?
13    A    Yeah, that's the -- where is that defined
14 here?  Social scientific -- I don't know.  I can't
15 come up with it --
16    MS. COMBS: Social Science Research
17 Network at the bottom.
18    THE WITNESS: There we go.
19    Q    (By Mr. Schultz) Is that a big deal to
20 you?
21    A    Well, it was more of a big deal for her
22 than for me.  I think this is a -- kind of a
23 tracking of the attention that these papers are
24 getting in these, you know, kind of downloading
25 sites and so forth.  Yeah, again, it was probably