# EXHIBIT C

# Testing Materiality under the Unfair Practices Acts: What Information Matters When Collecting Time-Barred Debts?

By Timothy E. Goldsmith and Nathalie Martin



Timothy E. Goldsmith, PhD is an associate professor in the Department of Psychology at the University of New Mexico. He is an applied cognitive psychologist with general interests in training, assessment, and modeling knowledge. His current research focuses on extracting and representing semantic information from large corpuses of text. He teaches courses in statistics, research methods, and applied psychology.



Nathalie Martin is a Professor of Law at the University of New Mexico School of Law, where she teaches Bankruptcy, Contracts, Secured Transactions, and other UCC classes. She also has taught in the Business and Tax Clinic, as well as Consumer Law and Business Associations. She has written a number of articles about bankruptcy law and other related topics, which are listed at http://lawschool.unm.edu/faculty/martin/publications.htm. Her current research involves payday lending legislation. Prior to teaching, she was in private practice in Philadelphia and Boston, where she specialized in Chapter 11 bankruptcy reorganizations. Professor Martin was the American Bankruptcy Institute Scholar in residence for the Fall of 2005. Professor Martin is also the Director of the law school's Economic Development Program.

## I. Introduction

Times are tough for consumers. For many, there is insufficient money to go around. Many debts simply won't be repaid. Yet more creditors than ever are now trying to collect debts that are no longer legally enforceable because the statute of limitations has run. Collection efforts against such time-barred debts have skyrocketed since creditors discovered that they could sell debts they already have written off.[1] Many of these debts are already time-barred before the collector or assignee creditor buys them and begins collecting them.[2] Though buyers of distressed debt know they will not collect most of it, they can still make a profit because they pay so little for the assignment of the obligations, and because some debtors obviously do pay.

Under various state unfair practices acts, as well as other applicable laws, material information about a debt must be disclosed to consumers during the collection process. This article asks whether creditors and debt collectors

---

1. Lauren Goldberg, *Dealing in Debt: The High-Stakes World of Debt Collection After FDCPA*, 79 S. Cal. L. Rev. 711, 725 (2006). Even at cents on the dollar, these sales can generate substantial sums. *Id.*

2. *Id.* Many lawyers are surprised to learn that a creditor or debt collector is allowed to try to collect on a time-barred debt. After all, it may seem that this is the point of having a statute of limitations. In reality, though, in most states time-barred debts still exist after the statute of limitations runs. *See* Charles Cahn, *Proceeding with Caution: Collecting Time-Barred Debts*, 56 Consumer Fin. L.Q. Rep. 244, 247 (2002).

There is no ability to sue on the debt, but the debt itself is not extinguished. This penumbra makes it unclear to most consumers whether they need to pay a time-barred debt, or can simply ignore the collection efforts. This is confusing only if the consumer knows that the debt is time-barred, however. Rarely is the fact that a debt is time-barred disclosed to the consumer.

*See generally* Wang v. Asset Acceptance, LLC, 2010 WL 409648 (N.D. Cal. Feb. 2, 2010), noted in Ralph T. Wutscher & David L. Beam, *Federal Preemption Case Law Developments*, in this issue, at Part III.F.

should be required to disclose the fact that a debt is time-barred when attempting to collect from a consumer.

This article describes an empirical study that compares how consumers react to two different collection letters, one in which the recipients are told explicitly that the debt being collected is time-barred, and one in which they are not given this information. The study measures whether consumers are equally willing to pay the debt, when they are told that the debt is time-barred. Not surprisingly, consumers who are told a debt is no longer legally enforceable are less likely to want to pay the debt, thus making this information relevant and material. This suggests that information that a debt is time-barred is relevant to a consumer's choice about whether to voluntarily pay the debt. Materiality bears on whether this information must be disclosed to consumers during the debt-collection process under applicable law.

## II. The Legal Basic Environment

Two different sets of laws apply to the collection of time-barred debts, depending on who is doing the collecting. One set applies to creditors collecting on their own debts, and another set to those hired to collect the debts of another (debt collectors). Generally, the federal Fair Debt Collection Practices Act (FDCPA)[3] applies to debt collectors and those who purchase debts, not the original creditor. The FDCPA provides a long list of specific limitations on collection efforts. Most relevantly, it precludes collectors from providing any misleading information to consumers about the debt, or threatening action that cannot legally be taken. Thus, it forbids collectors from threatening to sue or actually filing suit on a time-barred debt, but leaves open the question of which other collection efforts, short of suits or threats of suit, are permitted when the debt is time-barred.[4]

As noted, for creditors collecting on their own behalf, the FDCPA does not apply.[5] However, the Federal Trade Commission (FTC) Unfair Trade Practices Rules, as well as numerous state Unfair Trade Practices Acts, apply to original creditors collecting on their own behalf as well as debt collectors collecting for others. These laws create a patchwork of differing rules, but many require that the collecting creditor provide consumers with all "material" information about a debt when trying to collect it.[6]

## III. The Study

Does the fact that a debt is time-barred affect a debtor's desire and willingness to pay it?[7] This article tests the hypothesis that the fact that a debt is time-barred is relevant to a consumer's decision about whether to enter into a payment plan to pay that debt. The empirical study reported on here requested that consumers answer this question hypothetically, in a simulated setting in which some consumers are told that the debt for which payment is being sought is no longer legally enforceable because the statute of limitations has run, and others are not told this fact. The study then measured differences in responses between the two groups.

In the empirical study described here, consumer debtors who were told that a debt was time-barred were less likely to want to pay the debt in question, making clear that the fact that a debt is time-barred is material and thus may be a required disclosure under unfair trade practices laws. As noted, the study measured willingness to pay a time-barred debt in a simulated setting. In real life, a consumer might be even *less* willing to pay time-barred debts, especially if he or she is short on cash and unsure what future needs might be.

Depending on state law, courts can use the data from this study to require creditors and debt collectors to disclose the fact that a debt is time-barred when collecting on a time-barred debt, or risk liability under the state's unfair practices act. States also could adopt rules regarding specific language to be required in all correspondence relating to the collection of time-barred debts, thus ensuring that consumers are told that a debt is time-barred before deciding to pay it.

## IV. Debtor Nation: The Financial Facts of Life

### A. Current Debt Levels in America

Collectively, people use much more credit today than in the past. Consumer debt levels totaled $13.9 trillion at the end of 2008, twice the 2000 level.[8] In 2009, after the collapse of the credit bubble, when many creditors cut back lending and tightened credit standards, household debt levels dropped for the first

---

1. See 15 U.S.C. § 1692(A)(2008).

4. Id. See also infra Part V.A.

5. See infra Part V.A.

6. See, e.g., NMSA § 57-12-2(D)(14) ("using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive"); Code of Ala. § 8-19-15(a) (2009); Alaska Stat. § 45.50.471(b) (12) (2009) (using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged); A.C.A. § 4-88-10 (2010) (concealing a material fact); D.C. Code § 28-3904(e) (2010) (misrepresentation as to a material fact which has a tendency to mislead); HRS §§ 481A-1-481B-25(G) (2010); Md. Commercial Law Code Ann. § 13-301(3) (2010) ( failure to state a material fact if the failure deceives or tends to deceive); MCLS § 445.903 (1)(s)(2010) (failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer); S.D. Codified Laws § 37-24-6 (1) (2001) ("It is a deceptive act or practice for any person to: (1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby); W. Va. Code § 46A-6-102(M) (2010) ("When used in this article, the following words, terms and phrases, and any variations thereof required by the context, shall have the meaning ascribed to them in this article, except where the context indicates a different meaning:....(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby").

7. The point may seem obvious, but we could locate no other empirical support for the notion that knowing a debt is time-barred affects the willingness to pay.

8. See, e.g., Marie J. Lachance, Pierre Beaudoin & Jean Robitaille, Quebec Young Adults Use of and Knowledge of Credit, 30 Int'l J. Cons. Stud. 347, 355 (2006) (finding that credit use among Québec young adults increased drastically between 1995 and 2004).

time in years.[9] Some economists feared that the drop in credit levels and related spending might slow any economic recovery.[10] As noted below, this turned out to be largely a non-issue in 2009, as certain types of credit amounts jumped back up during the second half of 2009.

Among consumers with credit cards, for example, credit card debt increased eighteen percent nationally from July to December of 2009.[11] The Philadelphia area had the highest increase in credit card debt, with consumers racking up forty percent more in credit card debt between July and December 2009.[12] With unemployment topping ten percent, followed by the year-end holidays, many consumers resorted to credit cards to make ends meet.[13] Consumers also carry many other types of debts. At the end of 2009, the average consumer with an account had $8,079 in credit card debt, $184,940 in home mortgage loans, $53,744 in home equity loans, $14,899 in auto loans, and $26,692 in student loans.[14]

Credit scores also decreased in most regions in the second half of 2009. Credit scores dropped two points from July 2009 to January 2010. They dropped six points from January 2009 to January 2010.[15] Since that time the data has been somewhat more mixed, with particular problems in housing and mortgage finance.[16] But there can be no doubt that consumer debt levels remain high.

### B. Which Debts Don't Get Paid and Why

The most common forms of debts collected by debt collectors are those owed for: health care, including hospitals and doctors' offices; retail purchases, including department stores and credit-card companies; utilities; and commercial accounts, for businesses owing money to businesses.[17] Perhaps the most obvious reason people don't pay these debts is that they do not have the money to do so.[18] That of course, is just part of the story.

Why do people take on more debt than they can pay? This is a separate story, but probably some do not understand how interest charges work on their loans or how much they'll ultimately pay for the money they borrow.[19] People also may tend to underestimate their debts, particularly if they are paying them off in small increments over time.[20] And of course, people like to buy things and (as suggested above) sometimes just need the money, e.g., to pay for utilities, repairs, transportation, housing or health care.[21]

While some studies also show that consumers with certain psychological characteristics, such as people who are constantly seeking new experiences, are somewhat more willing to spend more, as are those who are more materialistic,[22] lack of available funds correlates highest of all with ultimate non-payment of a debt.[23] People with the highest debt-to-income ratios are least likely to pay their debts.[24] Other socio-economic factors, including education levels, also can predict debt payment rates. For example, renters are less likely to be able to pay debts than homeowners, as are minorities and people with less education, on the whole.[25] Younger people, and those who use sub-prime credit, are also less likely to be able to repay their debts.[26] Predictably, the amount of disposable income correlates highly with debt repayment.[27]

### C. Debt Buying: The Life Cycle of Distressed Debt

Now more than ever, some unpaid debts end up in the hands of debt purchasers and collection agencies. Beginning in the 1980s, debt purchasers started buying large chunks of distressed debts[28] from the original creditors, many of whom already had written off the bad debts.[29] This allowed debt buyers to achieve improved

---

9. David J. Lynch, *U.S. Debt Shrinking at Glacial Pace*, http://www.usatoday.com/money/perfi/credit/2009-07-86-usa-spending-debt_N.htm, last visited on March 24, 2010; *see also* Consumer Law Update, http://dowlinglawoffice.wordpress.com/2009/07/07/consumer-debt-levels/, last visited on March 24, 2010.

10. Tiernan Ray, *Household Debt Off 1.7% in 2009; Gov't Debt Slows*, Barron's, March 11, 2010, *available at* http://blogs.barrons.com/stockstowatchtoday/2010/03/11/household-debt-off-17-in-2009-govt-debt-slows/, last visited on May 14, 2010.

11. Will U.S. Consumer Debt Reduction Cripple the Recovery?, http://www.mckinsey.com/mgi/publications/us_consumer/index.asp, last visited on March 24, 2010. Between 2000 and 2007, U.S. households nearly doubled their outstanding debt to $13.8 trillion—an unprecedented amount in both nominal terms and as a ratio of liabilities to disposable income (138 percent). But as the global financial crisis worsened at the end of 2008, a shift occurred: U.S. households for the first time since World War II reduced their debt outstanding.

12. Consumer Credit Card Debt Increases by Double Digits in Nearly Every Region in Second Half of 2009, http://www.insidearm.com/go/arm-news/consumer-credit-card-debt-increases-by-double-digits-in-nearly-every-region-in-second-half-of-2009, last visited on March 24, 2010 (reporting on Credit Karma (www.creditkarma.com), the consumer's advocate for demystifying credit's report on credit trends for the second half of 2009). Each month, the Credit Karma U.S. Consumer Credit Score Climate Report compares the current credit scores of its user base with previous scores pulled at least 30 days prior and no more than 90 days prior in the stated month. The cited report includes a comparison of more than 87,000 Credit Karma user scores.

13. *Id.* In addition, consumers in five states increased their credit card balances by more than 30%. These states include: Indiana—credit card debt increased by 39%; Michigan—credit card debt increased by 30%; Oklahoma—credit card debt increased by 32%; Pennsylvania—credit card debt increased by 30%; and Tennessee—credit card debt increased by 34%. *Id.*

14. *Id.*

15. *Id.*

16. *See, e.g.*, Alejandro Lazo, *Home Prices Slide 0.8% in October*, L.A. Times, Dec. 29, 2010, at B1.

17. *See supra* note 12. The average credit score was 671 in January of 2010. *Id.*

18. Clifford J. Levy, *All About Debt Collection; Persuading People to Pay Their Bills During Hard Times*, http://www.nytimes.com/1991/12/15/business/all-about-debt-collection-persuading-people-to-pay-their-bills-during-hard-times.html?pagewanted=1, last visited on March 24, 2010.

19. Sonia M. Livingstone & Peter K. Lunt, *Predicting Personal Debt and Debt Repayment: Psychological, Social, and Economic Determinants*, 13 J. Econ. Psychology 111, 132 (1992) (finding a strong correlation between income and payment of debts). People with more income frequently have more debt as well. *Id.* at 124.

20. Alan Lewis & Marlies van Venrooij, *A Note on the Perception of Loan Duration and Repayment*, J. Econ. Psychology 161, 167 (1995) (noting that, particularly among those with no experience with credit, consumers frequently misunderstand how the interest on a loan works).

21. *See supra* note 17.

22. Annemarjie A. Overton & Alan J. MacFadyen, *Time Discounting and the Estimation of Loan Duration*, 19 J. Econ. Psychology 607, 617 (1998) (concluding that if a time-delay in repayment is added to a loan with relatively small repayment amounts over time, people significantly underestimate the amount due).

23. *See supra* note 18.

24. Jordan D. Troisi & Andrew N. Christopher, *Materialism and Money Spending Disposition Predictors of Economic and Personality Variables*, 8 N. Amer. J. of Psychology 421 (2006).

25. Sharon A. DeVaney & Ruth H. Lytton, *Household Insolvency: A Review of Household Debt Repayment, Delinquency, and Bankruptcy*, 4 Fin. Servs. Rev. 137, 140-141 (1995).

26. *Id.* at 140.

27. *Id.* at 141.

28. *Id.* at 142.

29. As used here, this phrase means debt that has been written off by the original creditor, or for which the statute of limitations has run, or both.

economies of scale.[30] It also resulted in far greater collection efforts on time-barred debts, as many of the debts written off and then subsequently sold were quite old. The New Mexico Attorney General's Office noticed this uptick in attempted collection efforts of time-barred debts in 2007 and 2008. The study discussed in this article tests consumers' understanding of time-barred debts, as well as their willingness to pay such debts.

### V. The Law of Time-Barred Debts

In most states, even if a statute of limitations on a debt has run, the debt is still due.[31] However, various laws apply to determine whether and how a time-barred debt can be collected.

#### A. Basic Collection Law for Debt Collectors: The Fair Debt Collection Practices Act

The FDCPA was enacted in 1977 to stop abusive, deceptive, and unfair debt collection practices by collection agencies.[32] Congress described the purpose of the FDCPA as being: "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."[33] Other articulated goals of the FDCPA include to "ensure that every individual, whether or not he owes a debt, has the right to be treated in a reasonable and civil manner," and to "prevent the loss of jobs and the debtors' embarrassment which can arise during the collection process."[34]

The FDCPA prohibits a wide array of collection practices, including "the use of false or deceptive means to collect a debt, communications with third parties concerning a debt, harassment, threats of violence, the use of obscene or profane language, and threats of any action that the debt collector does not intend to take."[35] Most critical for our discussion here, the FDCPA limits a debt collector's representations in collecting debts. Specifically, a debt collector may not harass or abuse a consumer in an attempt to collect a debt,[36] "use any false, deceptive or misleading representations in connection with the collection of any debt," or "use unfair or unconscionable means to collect or attempt to collect a debt."[37] Clearly, collectors may not make any false representation of the character, amount, or legal status of any debt, threaten to take any action that cannot legally be taken or that is not intended to be taken, or use any false representation or deceptive means to collect, or attempt to collect any debt or to obtain information concerning a consumer.[38]

Moreover, many courts view FDCPA claims through the eyes of an unsophisticated debtor.[39] Thus, a debt collector may not file time-barred lawsuits against a debtor where the debt collector knows or reasonably should have known it was time-barred.[40]

Overall, the FDCPA is an improvement over no law at all, but still has significant limitations. It is ambiguous in a number of important ways, and most of its provisions are unknown to consumers, who thus have no real way of enforcing their rights under it.[41] Perhaps most critically, however, the FDCPA does not apply to the original creditor. Thus, by negative implication, the original creditor is allowed to call consumers at all times of the day or night, talk to third parties about the debts, and do everything else precluded by the FDCPA. This is a huge deficiency of the FDCPA. While creditors were originally bound by an earlier draft of the law, they were excluded in the final draft of the legislation, leaving no relief under this law for

---

30. Goldberg, *supra* note 1, at 725-26.

31. Goldberg, *supra* note 1, at 727; *supra* note 2.

32. *See* Gall, *supra* note 2, at 244; *but see, e.g.*, Klewer v. Cavalry Investments LLC, 2002 WL 2018830 (W.D.Wis., Jan. 30, 2002) (finding that the expiration of the applicable statute of limitations extinguished the underlying debt pursuant to § 893.05 of the Wisconsin Statutes).

33. *See, e.g.*, Goldberg, *supra* note 1, at 719; 15 U.S.C. §§ 1692-1692o (2009).

34. 15 U.S.C. § 1692(e) (2009).

35. David A. Schulman, *The Effectiveness of the Federal Fair Debt Collection Practices Act (FDCPA)*, 2 Bank. Dev. J. 171, 174 (1985) (noting that collection agencies, credit issuers, and consumers acknowledge that debtors are more likely to pay collection agents than the original creditor).

36. *See* Lynn A.S. Araki, *Rx for Abusive Debt Collection Practices: Amend FDCPA*, 17 U. Haw. L. Rev. 69, 75-76 (1995) (finding that merchants and creditors have started to assign accounts to debt-collection professionals earlier, in an effort to collect from consumers who will likely eventually file for bankruptcy). The FDCPA also limits a debt collector's means of communicating with debtors, as well as third parties, and the frequency and manner in which such contacts can be made. The "FDCPA defines 'communication' as the conveying of information regarding a debt directly or indirectly to any person through any medium." Mike Voorhees & Sharon Voorhees, *The Fair Debt Collection Practices Act, Communications, and Privacy Issues*, 58 Consumer Fin. L.Q. Rep. 78, 78 (2004). For example, in order to protect the debtor's job, a debt collector is only allowed to contact a debtor's employer to get information related to the debtor's whereabouts. *See* Goldberg, *supra* note 1, at 721; *see also* 15 U.S.C. § 1692b. The debt collector may not contact any third party more than once about a debt or disclose that a debt is even due. 15 U.S.C. § 1692b(1). The FDCPA also restricts when and where a debt collector can contact the debtor. The statute specifically states that "[a] debt collector may not communicate with the consumer at any unusual or inconvenient time and place." Goldberg, *supra* note 1, at 721. Additionally, a debt collector may only contact the debtor between eight o'clock in the morning and nine o'clock at night. 15 U.S.C. § 1692c(a)(1). Also, the debt collector generally may not contact the debtor at work. Goldberg, *supra* note 1, at 721. This provision is intended to prevent debt collectors from calling debtors at all times of the day or night, or at work, or otherwise harassing them in surprising locations.

The FDCPA outlines specific guidelines that the debt collector must follow when the debtor disputes the debt's validity or the validity of any interest and collection charges. Within five days of the initial communication with the debtor, a debt collector must provide "a written notice stating the amount of the debt, the name of the creditor to whom it is owed and a statement notifying the consumer that unless he disputes the debt in writing within thirty (30) days, the debt collector will consider the debt valid." This provision is intended to provide the debtor with ample opportunity to investigate the debt collector's claims and confirm whether the debt allegations are valid.

*See* Goldberg, *supra* note 1.

37. 15 U.S.C. § 1692(e).

38. *Id.* The penalties for violating these rules include actual damages, court costs, and attorneys' fees. *Id.* §1692k. As Lauren Goldberg states:

> If a debt collector violates any FDCPA provisions, the consumer can sue, within one year of the violation, for actual damages, court costs, and attorney's fees. The generous award of attorney's fees is intended "to encourage consumer enforcement of the act." Additionally, the consumer can file a complaint with the FTC to encourage the commission to pursue an action against the violator, although the grievances must be fairly extreme and numerous for the FTC to further investigate the alleged violation.

*See* Goldberg, *supra* note 1.

39. *See, e.g.*, Ramirez v. Palisades Collection L.L.C., 2008 WL 2512679 (N.D. Ill. 2008).

40. *Id.; see also* Gall, *supra* note 2, at 245-46.

41. As Goldberg explains, "even when debtors are aware of the statute, they are unlikely to bring a lawsuit under FDCPA for many reasons." Goldberg, *supra* note 1, at 722. First, "it will likely be less costly and time-consuming to pay the small debt than to litigate. Second, if a debtor's suit is brought in bad faith, the court may award attorney's fees to the debt collector. Finally, the debt collector can easily escape liability for violating [the] FDCPA by showing that the violation was either unintentional or not easily preventable." *Id.* (citations omitted).

debtors who are mistreated in their original creditor's attempts to collect a debt.

### B. Unfair Trade Practices Acts: Collections by Creditors Themselves

Although the FDCPA does not apply to the original creditor, state unfair practices acts apply to debt collectors, debt buyers, and original creditors. Virtually every state has enacted an unfair or deceptive trade practices statute, modeled in large part on the Federal Trade Commission Act (the FTC Act).[42] These statutes govern the sale of goods as well as the collection of debts. Sometimes called "little FTC Acts," these statutes give consumers a private cause of action, allowing them to assert claims or defenses against creditors that violate recognized trade standards.[43] Section 5(a)(1) of the FTC Act[44] and the unfair trade practices acts of most states prohibit "unfair...acts or practices."[45] All but two of these state statutes[46] leave open for interpretation what exactly constitutes an unfair or deceptive practice. Most state statutes provide that any violation of one of these statutes entitles a consumer to stiff penalties, including punitive damages and attorneys' fees, making these laws valuable tools for consumers.[47]

Some state laws are more specific. For example, New Mexico's Unfair Practices Act provides that it is a violation of the state Unfair Trade Practices Act to fail to state a material fact when collecting a debt, if doing so "deceives or tends to deceive."[48] This raises the question of what facts are material to the collection of a debt.

In one case, a New Mexico court held that an insurance company violated the materiality provision by failing to disclose to its insured, a manufacturer, that health insurance purchased for the insured's employees might not provide adequate coverage for those employees.[49] The lack of disclosure flowed from a failure of the insurance company to fully disclose its method for calculating the rates charged to the insured, and a failure to explain that lower rates now could result in spikes in future rates.[50] In another case, a court found that an insurer violated the Unfair Practices Act when it failed to disclose that paying the premiums in installments would result in an additional cost to the insured.[51] Finally, another New Mexico court found that a failure to disclose that a used car had been used as a rental car in the past violated the material disclosure requirement.[52] Many cases from other courts around the country have similarly found that unfair practices acts are violated when sellers of cars,[53] other goods,[54] and homes[55] fail to disclose a fact that might have caused a purchaser to forego the purchase.[56] In addition, a court recently held that it is an unfair practice to fail to disclose any fact relating to a financial product that, if disclosed, might have caused the consumer to forego the product.[57]

42. Section 5 of the FTC Act proscribes "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). See also Burt M. Rublin, "Authority of Federal Banking Agencies to Regulate Allegedly Unfair or Deceptive Acts and Practices by Credit Card Issuers," 1472 PLI/Corp 409, 411 (2005); Christopher L. Peterson, Predatory Structured Finance, 28 Cardozo L. Rev. 2185, 2225 (2007); NATIONAL CONSUMER LAW CENTER, UNFAIR ACTS AND DECEPTIVE PRACTICES § 1.1 (6th ed. 2004).

43. See Peterson, supra note 42, at 2225.

44. 15 U.S.C. § 45(a)(1) (2006); see also David L. Belt, The Standard for Determining "Unfair Acts or Practices" Under State Unfair Trade Practices Acts, 80 Conn. B.J. 247, 249 (2006).

45. Alaska Stat. § 45.50.471(a) (LexisNexis 2006); Cal. Bus. Prof. Code § 17200 (2006); Conn. Gen. Stat. § 42-110b(a) (2006); Fla. Stat. Ann. § 501.204(1) (West 2009); Ga. Code Ann. § 10-1-393(a) (LexisNexis 2009); Haw. Rev. Stat. Ann. § 480-2(a) (LexisNexis 2009); Ill. Comp. Stat. Ann. Ch. 815 § 505/2 (West 2009); Iowa Code Ann. § 714.16.2.a (West 2009); La. Rev. Stat. Ann. §1405.A (West 2009); Me. Rev. Stat. Ann. tit. 5, § 207 (West 2009); Md. Comm. Law Code Ann. § 13-301 (2006); Mass. Gen. Laws Ann. Ch. 93a §2(a) (West 2006); Mix. Code Ann. § 75-24-5(1) (2006); Mo. Ann. Stat. § 407.020.1 (West 2009); Mont. Code Ann. § 30-14-103 (2009); Neb. Rev. Stat. Ann. § 59-1602 (LexisNexis 2009); N.H. Rev. Stat. Ann. § 358-a:2 (2009); N.C. Gen. Stat. § 75-1.1(a) (2009); Ohio Rev. Code Ann. § 1345.02(a) (West 2009); Okla. Stat. Ann. § 15-753.20 (West 2009); P.R. Laws Ann. tit. 10, § 259(a) (2009); R.I. Gen. Laws § 6-131.1-2 (2009); S.C. Code Ann. § 39-5-20(a) (2009) (West); Tenn. Code Ann. § 47-18-104(a) (2009); Vt. Stat. Ann. tit. 9, § 2453(a) (2009); Wash. Rev. Code Ann. § 19.86.020 (West 2009); W. Va. Code Ann. § 46a-6-104 (LexisNexis 2009); Wis. Stat. Ann. § 100.20 (West 2009); Wyo. Stat. Ann. § 40-12-105 (xv) (LexisNexis 2009).

46. Iowa Code Ann. § 714.16.1.n (West 2009); Okla. Stat. Ann. § 15-752.14 (West 2009).

47. See Mark E. Swirbalus, New Rubric of Risk, Unfair Trade Practices, SN003ALI-ABA 77, 77 (2007).

48. See NMSA § 57-12-2(D)(14).

49. Woodworker's Supply, Inc. v. Principal Mutual Life Insurance co., 170 F.3d 985, 988-89 (1999). See also Anderson v. State Farm Insurance, 101 Wash. App. 323, 2 P.3d 1029 (2000).

50. Woodworker's, 170 F.3d at 989. The court explained that:

> Principal Mutual also failed to fully disclose certain aspects of the method it used to calculate rates, increasing the likelihood that Woodworker would experience large rate increases and charges in excess of the preliminary premiums. For example, Principal Mutual's method for determining reserves to cover "incurred but not reported" expenses deviated from the industry norm and significantly impacted Woodworker's renewal program. Principal Mutual did not disclose this to Woodworker until February 1995. In addition, while the contract mentioned pooling charges, it did not indicate that such charges could equal up to 15% of the contract premium. Even though Woodworker paid $178,000 in premiums in 1994, its claims would have to have been less than $50,000 to avoid an end of the year surcharge. Had Woodworker known this prior to March 1, 1994, it would not have contracted with Principal Mutual.
>
> As would be expected, Principal Mutual's omissions resulted in a significant charge at the end of 1994 as well as a large rate increase for the following year. Severe disagreements ensued between Principal Mutual and Woodworker. Woodworker refused to pay the increase in the rates, as well as the 1994 surcharge. Principal Mutual demanded payment and unilaterally increased the 1995 rates. Finally, Principal Mutual terminated Woodworker's coverage effective midnight, August 31, 1995.

51. Azar v. Prudential Insurance Co., 133 N.M. 669, 689, 68 P.3d 909, 929 (2003).

52. Salmeron v. Highlands Ford Sales, Inc., 271 F. Supp.2d 1314, 1317-18 (2003).

53. Brown v. Cheyautos, Inc., 2009 WL 88735 (S.D. Ohio 2009); Baskill v. Harnell, 2000 WL 943782 (Ohio App. 2000); Thompson v. Main Street Auto Sales & Service, 1999 Mass App. Div. 260 (Mass App. 1999); Andrews v. Scott Pontiac Cadillac GMC, Inc., 71 Ohio App. 3d 613, 594 N.E. 2d 1127, 1991 WL 329785 (Ohio App. Ct. 1991); State ex. Rel. Attorney general of Ohio v. Mid-Ohio Imported Car Co., 1990 WL 692683 (Ohio Comm. Pl. 1990); Morgan v. Air Brook Limousine, Inc., 211 N.J. Super 84, 510 A. 2d 1197 (N.J. Super. 1986).

54. Williams-Ward v. Lorenzo Pitts, Inc., 908 F. Supp. 48 (D. Mass. 1995) (dealing with a lease in which the property knowingly contained lead paint); Reese v. Payless Drug Stores Northwest, Inc., 43 Cal. App. 4th 1317, 34 Cal. App. 4th 19, 39 Cal. App. 4th 160, 40 cal. Rptr. 2d 75 (1995) (dealing with the sale of products containing saccharin without disclosure); Knapp Shoes, Inc., Sylvania Shoe mfg. Corp., 418 Mass 737, 640 N.E. 2d 1101 (1994) (dealing with a failure to disclose repair costs); Double-Eagle Lubricants, Inc., State of Texas, 248 F. Supp. 515 (N.D. Tex. 1965) (dealing with the sale of used lubricating oil without disclosing that the oil is used).

55. Walker v. Fleetwood Homes of North Carolina, Inc., 362 N.C. 63, 653 S.E.2d 393 (N.C. Sup. Ct. 2007).

56. This rule applies to serial as well. In one case a limitation of liability by a dry cleaner who stored mink coats was found to violate the applicable unfair practices act. See Lodie v. Anton's Cleaners, 1993 WL 30808 (Mass. App. Div. 1993). One must also disclose the odds of winning when offering a free prize, see State ex. Rel. Celebrezze v. Frontier Vacation resort, Inc., 1985 WL 650265 (Ohio Comm. Pl. 1985). One cannot even call an offer a "free offer" if getting the free item requires a customer to spend money. See Luskin's Inc., Consumer Protection Div., 353 Md. 335, 726 A. 2d 702 (Md. Sup. Ct. 1998).

57. In re Washington Mutual Overdraft Protection Litigation, 539 F. Supp. 1136 (20008) (dealing with a failure to disclose overdraft fees).

## VI. Study Results: Does Knowledge of Judicial Unenforceability of Time-Barred Debt Affect Consumers' Repayment Decisions?

### A. Basic Issues

The purpose of the study underlying this article was to investigate consumers' decisions about repaying time-barred debts. More specifically, we were interested in knowing whether certain debt-related information would influence a consumer's choice of debt repayment plan. As set out in Part V.A. above, under many states' unfair trade practices acts, debt collectors are required to disclose material information to consumers. Time-barred debt cannot be enforced in the courts because the applicable statute of limitation has ended. A creditor cannot sue to collect the debt and so the debtor must decide whether to voluntarily pay the debt.

But what exactly constitutes material information? How does one know whether the information in question would indeed influence a consumer's decision processes and ultimately his or her behavior? Would knowing the critical information about time-barred debt influence a debtor's decision about repaying the loan? If so then the information is material, and under many state laws a debt collector could be obligated to inform consumers of this information in any communication attempting to collect the debt.

The question we address here is generally relevant to state laws pertaining to material information--information that if known by a consumer would likely affect his or her behavior. In general, how does one know whether certain information will indeed influence a consumer's decision processes and ultimately his or her behavior?

Questions about what affects a person's future behavior are inherently difficult to answer. However, over the last several decades behavioral scientists have developed empirical methods for eliciting peoples' judgments and decisions about future events. One common method for studying such judgments is to create a decision-making scenario in which subjects are asked to make a prediction or choose some course of action. Often a critical piece of information is manipulated between two otherwise identical scenarios given to two different groups of participants. Any differences in the two groups' choices can then be attributed to the presence of the critical information. For example, Kahneman and Tversky[38] showed subjects descriptions of individuals and asked them to predict how likely they were to be a member of a given profession. Slight changes in the narrative descriptions of the individuals allowed Kahneman and Tversky to infer the role of base rate information on people's predictions.

In our study, we applied a similar method to ascertain the effect of material information on people's choices about repaying debt. Although it may seem obvious that such information would in fact influence a consumer's decision about repaying debt, we sought objective and empirical support of this effect. Our hypothesis was that knowing that time-barred debt was judicially unenforceable would affect an individual's decision about selecting a plan to repay the debt. In the discussion below, we describe an experiment designed to test this hypothesis.

### B. Study Methodology

Our study used a randomized, independent groups design. Participants were randomly assigned to one of two versions of a scenario-based survey. In both groups, participants were asked to assume that they had a debt from the past and had received a letter from a debt collection agency requesting them to select a debt repayment plan. Appendix A shows the wording of this question along with other questions in the survey. Participants were asked to choose among four options for repaying the debt. These options were modeled after actual letters sent to consumers by debt collection agencies.

There were two versions of the scenario that corresponded to the two groups of participants. The scenarios were identical except for the presence of the critical piece of information about time-barred debt. The debt scenario for Survey A included the following sentence: *In the letter, you are told that this debt cannot be enforced against you through court action because the enforcement period has run out.* This sentence was left out of Survey B. Random assignment assured that participants in the two groups would in the long run be identical in all other respects. Hence, any differences between the two groups' selection of repayment options could be attributed to the presence of this information.

In addition to the debt scenario, we asked participants two questions that were intended to shed further understanding on their decision processes. These two questions were of secondary importance. Survey A participants were asked whether the information about time-barred debt had influenced their choice of a repayment plan. Survey B participants were told about the time-barred debt information and asked whether, if they had known this information, it would have influenced their decision. Both groups were then asked whether their choice of a repayment plan would have differed if they had known that their credit rating would not be affected by their choice. At the beginning of the survey, participants were asked their age, sex, education level, income level and largest non-mortgage debt.

An internet survey was administered by the Institute for Social Research at the University of New Mexico. A newspaper ad describing the purpose of the survey was placed in local newspapers of several large cities across the state of New Mexico. The survey was conducted during August, 2008. Participants were directed to a web site hosted by the University of New Mexico to complete the survey. The study was approved by the university's Institutional Review Board.

---

38. Daniel Kahneman & Amos Tversky, *On the Psychology of Prediction*, 80 Psychol. Rev. 237-51 (1973).

378　　QUARTERLY REPORT

## C. Study Results

A total of 147 people responded to the survey, of which seventy-eight were randomly assigned to Survey A and sixty-nine were assigned to Survey B. Of these 147 respondents, ten failed to answer the critical debt scenario question and so were excluded from further analysis leaving seventy-four participants in Survey A and sixty-three participants in Survey B.

Table 1 shows the results from the demographic questions. The percentages of respondents in each demographic category are shown separately for Survey A and Survey B participants. In general, the participants were a relatively diverse group of individuals with respect to age, income, and education. More females (seventy-two percent) participated in the study than males (twenty-eight percent).

Table 1. Percentage of respondents in each demographic category.

|  |  | Survey A (%) N=74 | Survey B (%) N=63 |
|---|---|---|---|
| Sex | Male | 32 | 22 |
|  | Female | 68 | 78 |
| Age | 18 – 30 | 16 | 14 |
|  | 30 – 50 | 39 | 37 |
|  | 50 – 70+ | 45 | 49 |
| Annual Household Income | <$30,000 | 23 | 19 |
|  | $30,000 – $59,999 | 32 | 30 |
|  | $60,000 – $89,999 | 23 | 25 |
|  | >$90,000 | 22 | 25 |
| Education Level | HS, GED, Tade, or Vocational Certificate | 7 | 6 |
|  | Some College or Associates | 23 | 19 |
|  | Bachelor's | 34 | 40 |
|  | Master's | 28 | 30 |
|  | PhD or JD | 8 | 5 |
| Highest Debt | None | 24 | 29 |
|  | <$10,000 | 43 | 32 |
|  | $10,0000 – $29,999 | 11 | 27 |
|  | $30,000 – $59,999 | 7 | 3 |
|  | $60,000 – $89,999 | 5 | 0 |
|  | >$90,000 | 9 | 10 |

Note: See Appendix A for the actual survey questions.

Of particular interest was whether the two groups of participants assigned to Survey A and Survey B differed along the lines of any significant demographic characteristics. Because participants were randomly selected and assigned, their demographic characteristics should not differ. A $X^2$ test of statistical significance was performed on each demographic variable to determine whether the proportions of participants answering in various ways differed between Survey A and Survey B. All of these $X^2$ tests were not significant at the standard $a = .05$ level of significance. Hence, the two groups of participants could be viewed as statistically similar across all five (sex, age, education, income, debt) demographic variables.

Of particular interest was whether Survey A and Survey B respondents answered the critical debt scenario question differently. Table 2 shows the percentage of respondents who chose each repayment option. A larger proportion of Survey A respondents (thirty-four percent) chose to decline payment of the debt compared to Survey B respondents (six percent) and a smaller proportion of Survey A respondents (twenty-seven percent) chose the one-time payment option compared to Survey B respondents (fifty-six percent). A $X^2$ statistical test comparing the proportions of responses between Survey A and Survey B respondents was highly significant ($X^2 = 19.15$, df = 3, p < .001), indicating that the two groups chose different debt repayment actions.

Table 2 also shows the responses for the final two debt scenario questions. When directly asked whether the information that the debt could not be enforced against them was important, fifty-five percent of Survey A respondents said that it was important in choosing a debt repayment action. For Survey B respondents, who were not given the information but then were later asked whether the information would have been important in choosing a debt repayment action, thirty percent responded that it would be. These results further corroborate the finding that actually knowing the critical information about a debt repayment decision does

Table 2. Percentages of respondents giving particular answers to debt scenario questions.

| | | Survey A (%) N=74 | Survey B (%) N=63 |
|---|---|---|---|
| Debt Scenario Question | decline to pay | 34 | 6 |
| | one-time payment | 27 | 56 |
| | monthly payments—full | 31 | 32 |
| | monthly payments—50% | 8 | 6 |
| Was Information Important | Yes | 55 | 30 |
| | No | 45 | 59 |
| | No response | 0 | 11 |
| Not Affect Credit Rating | decline to pay | 49 | 43 |
| | one-time payment | 18 | 22 |
| | monthly payments—full | 27 | 19 |
| | monthly payments—50% | 7 | 5 |
| | no answer | 0 | 11 |

Note: See Appendix A for the actual survey questions.

indeed influence a decision maker's choice of a debt repayment action.

Finally, the Fair Credit Reporting Act prohibits the reporting of an unpaid debt for more than seven years after the default. When participants were asked to choose a debt repayment program knowing that their credit rating would not be affected, the proportion of respondents choosing to decline to pay the debt increased substantially for both Survey A and Survey B respondents.

## VII. Conclusion

The major finding of the study is that knowing that a debt was no longer judicially unenforceable influenced consumers' decisions about choosing a debt repayment plan. Those participants who were told that the debt could not be enforced through court action chose different repayment options than participants who were not told about time-barred debt. In all other respects the two groups of participants were statistically identical. Hence, time-barred debt information was clearly material information and such information should be included in any communication to debtors.

This principle was recently put to use when the New Mexico Attorney General's Office instituted suit against several debt buyers for collecting on time-barred debts. For example, in 2007, the Attorney General's Office sued Merchant's Credit Guide Company (Merchant's) under the New Mexico Unfair Practices Act for disgorgement, restitution, and civil penalties, resulting from Merchant's attempts to collect time-barred debts it purchased from original creditors in the secondary and tertiary markets. Merchant's specializes in collecting distressed debt that has been written off by the original creditor or for which the state of limitations has run, or both.

The complaint against Merchant's alleged that Merchant's knew the debts it attempted to collect were time-barred, knew this fact was material to the customers it dunned, but failed to disclose this fact to the customers, in violation of the part of the state unfair trade practices act that forbids collectors from failing to disclose any material fact in a manner that misleads or deceives debtors, or has a tendency to so deceive or mislead.

The Merchant's lawsuit never reached trial. Rather it resulted in a cash settlement by Merchant's to the New Mexico Attorney General's Office, as well as an injunction against Merchant's collecting any time-barred debts in New Mexico, unless it discloses to all consumers being collected from, in large type, that the debt alleged to be owed "is not enforceable in a court of law due to the running of the statute of limitations, and that the debtor cannot be forced to or required to pay the debt through legal action."

Other states may follow suit and stop debt buyers, debt collectors, and original creditors from attempting to collect time-barred debts without disclosing the fact that the debt is no longer judicially enforceable to customers. The study reported on here establishes that the fact a debt is time-barred is relevant to consumers and is thus material under the applicable materiality provisions found in some state unfair practices acts.

Moreover, states can adopt regulations regarding the collection of debts similar to the one recently adopted in New Mexico. This regulation states that it is an unfair or deceptive trade practice, and a violation of the New Mexico Unfair Practices Act, to try to collect a time barred debt without stating that:

> Although this debt is valid under New Mexico law, the applicable statute of limitation has run and the debt cannot be enforced in a court of law. In other words, you cannot be required to pay the debt through legal action. You may, however, pay voluntarily. Any admission or other acknowledgement of the debt by you, including by any oral or written statement or by making a partial payment, may result in the statute of limitation starting over again (being revived).[59]

This language can be borrowed by any state wishing to curb the abuses that sometimes occur when creditors and collectors try to collect on time-barred debts.[60]

The study reported on here has other implications. More generally, the study defined a methodology for empirically investigating whether information is material. Combining an experimental manipulation in a randomized groups design with an internet survey yielded a powerful yet efficient research design. Similar experiments could be performed to answer questions about material information in other domains. Thus, this study's methodology could have significant implications for those who seek to test materiality in other contexts.

---

59. See N.M. Proc. R. Rule 12.2.1 (2010). The Association of Credit and Collection Professionals (the ACA), a trade association representing debt collectors, submitted comments in February and June of 2009 to the New Mexico Attorney General's proposed rules. The comments indicated that the ACA believed that the new disclosures would confuse consumers because debts are listed on credit reports for seven years but the statute of limitations is six, and that the disclosure language was also confusing. The ACA also argued that the disclosure was legally flawed because the fact that the statute of limitation has run must be affirmatively pled, that because the issue of whether a debt is time-barred is a matter of law not fact, and that as such, making the disclosure could constitute the unauthorized practice of law. The ACA also argued that there was a conflict between section 809 of the FDCPA, concerning communications relating to a debt, and this New Mexico requirement, which would further confuse consumers. Finally, the ACA argued that making this additional disclosure would add 20 seconds to the required telephone disclosures. None of this affected the Attorney General's decision to approve these changes.

60. A similar law became effective on April 24, 2010, for anyone who collects debts in New York City. See N.Y., R.C.N.Y. tit. 6, ch. 2, § 2-190 (2010), available at http://www.nyc.gov/html/dca/downloads/pdf/debt_collection_agency_law_rules.pdf, last visited on July 29, 2010). This section, entitled Documentation of the debt to be provided by debt collection agency, states that the following disclosure must be included in every written communication sent to a consumer to attempt to collect time-barred debt:

> The legal time limit (statute of limitations) for suing you to collect this debt has expired. However, if somebody sues you anyway to try and make you pay this debt, court rules REQUIRE YOU to tell the court that the statute of limitations has expired to prevent the creditor from obtaining a judgment. Even though the statute of limitations has expired, you may CHOOSE to make payments. However, BE AWARE: If you make a payment, the creditor's right to sue you to make you pay the entire debt may START AGAIN."

Id.

Appendix A
Survey Questions

Demographic questions asked of all participants:

1. Are you male or female?

2. What is your age?

3. What is the highest level of education you have completed?

4. What is your total household income?

5. Select the range of your highest amount of debt accrued to date, excluding mortgage.

Survey A Questions:

6A. Assume that you have a debt from the past. You stopped making payments on this debt more than six years ago, and the debt was eventually sent to a debt collection agency for collection. You receive a letter from this agency requesting that you mark one of the choices below and return your response to them. IN THE LETTER, YOU ARE TOLD THAT THIS DEBT CANNOT BE ENFORCED AGAINST YOU THROUGH COURT ACTION BECAUSE THE ENFORCEMENT PERIOD HAS RUN OUT. Based on what you know about this situation, which of the following actions would you most likely choose?

(a) make a one-time payment of 30% of your balance to settle your balance in full.

(b) make three equal monthly payments that together equal 50% of your balance.

(c) make monthly payments that you can afford until the total amount of the debt is paid in full.

(d) decline to pay the debt.

7A. Was the information that the debt could not be enforced against you because the enforcement period had run out important to you in deciding what to do, even if it was not the determining factor in making your decision?

(a) yes.

(b) no.

8A. If you had known that your choice would not affect your credit rating, which of the following actions would you have chosen?

(a) make a one-time payment of 30% of your balance to settle your balance in full.

(b) make three equal monthly payments that together equal 50% of your balance.

(c) make monthly payments that you can afford until the total amount of the debt is paid in full.

(d) decline to pay the debt.

Survey B Questions:

6B. Assume that you have a debt from the past. You stopped making payments on this debt more than six years ago, and the debt was eventually sent to a debt collection agency for collection. You receive a letter from this agency requesting that you mark one of the choices below and return your response to them. Based on what you know about this situation, which of the following actions would you most likely choose?

(a) make a one-time payment of 30% of your balance to settle your balance in full.

(b) make three equal monthly payments that together equals 50% of your balance.

(c) make monthly payments that you can afford until the total amount of the debt is paid in full.

(d) decline to pay the debt.

7B. Assume that you had been told in the letter from the debt collection agency that the debt could not be enforced against you through court action because the enforcement period had run out. Would this information have been important to you in deciding what to do, even if it was not the determining factor in making your decision?

(a) yes

(b) no

8B. Again, assume that you had been told in the letter from the debt collection agency that the debt could not be enforced against you through court action because the enforcement period had run out. If you had known that your choice would not affect your credit rating, which of the following actions would you have chosen?

(a) make a one-time payment of 30% of your balance to settle your balance in full.

(b) make three equal monthly payments that together equal 50% of your balance.

(c) make monthly payments that you can afford until the total amount of the debt is paid in full.

(d) decline to pay the debt.