# EXHIBIT D

## Assessment of "Testing Materiality under the Unfair Practices Acts" and Related Research Materials by Dr. Timothy E. Goldsmith

By

James D. Wright, PhD
4219 Vanita Court
Winter Springs, Florida 32708

james.wright@ucf.edu

September 29, 2014

My name is James D. Wright, PhD, and I am a Pegasus Professor and the Provost's Distinguished Research Professor in Sociology at the University of Central Florida in Orlando. I have been a survey practitioner and have taught PhD level courses in research design and analysis for nearly 40 years. I am the co-editor of both editions of the *Handbook of Survey Research* (Academic Press, 1983; Emerald Press, 2010). I am also the editor of the scholarly journal *Social Science Research*, the Editor in Chief of the *International Encyclopedia of the Social and Behavioral Sciences* (forthcoming 2015 from Elsevier) and I am currently the Director of the Institute for Social and Behavioral Sciences at UCF.

I have read the subject report and related materials and exhibits (hereafter, the "Goldsmith Study"). I have also read Dr. Goldsmith's deposition dated April 29, 2013. My assessments of the Goldsmith study are as follows:

1. The study implements an experimental design via data collected in an Internet survey. Since the data collection modality was an Internet survey, questions about the adequacy of the survey design are appropriate, the experimental element of the study notwithstanding. The survey that was conducted was not based on a probability sample of anything; rather, the sample was self-selected, as I discuss below.

2. The subject report was published in Consumer Finance Law Quarterly Report, which does not appear to be a peer-reviewed scientific journal.

3. Experiments are indeed "more powerful" than simple cross-sectional research in the restricted technical sense that experiments are better able to sort out cause and effect. In the language of research methods, experiments have high *internal validity*. But this is only one of two principal evaluative criteria, the second being *external validity*, which is a question about the statistical generalizability of the results.

Internal validity is a matter of the design of a piece of research; external validity depends on the sampling methodology by which respondents (or research subjects) were chosen. Studies like the Goldsmith study are relatively high in internal validity but have little or no external validity; that is, they cannot be statistically generalized to any known population of interest

1

(specifically because they are not based on true probability samples of any known population of interest).

4. On p. 142 of the deposition, Dr. Goldsmith asserts, "The intended population of this study was New Mexico residents, adult residents, 18 years of age and older. No other restrictions." This is not correct. Study subjects were recruited through advertisements placed in local papers in five New Mexico cities. So in order to be in the subject pool, people had to reside in or near one of these five cities *and* read the local paper. Nationally, according to the Pew Research Center, only 23% of the US population reads a daily print newspaper, a percentage that has been in decline for as long as Pew has asked the question.[1] In addition to these restrictions, study participants also had to read the section of the paper where the advertisements were placed, be inclined to volunteer for an online survey, and possess the equipment and technical skills to respond to an online survey. I cannot say definitively how much of the adult population of New Mexico would have been excluded by these various criteria, but that percentage must be in excess of 90%.

5. A key point of the article, also stressed in Dr. Goldsmith's deposition, is that "Those participants who were told that the debt could not be enforced through court action were more likely to choose to decline to pay the debt than participants who were not told about the time-barred debt." This too is technically incorrect in that the study does not look at actual behaviors but only at *opinions* or *attitudes* about possible behaviors. So it is not correct that those "who were told that the debt could not be enforced..." were more likely to decline to pay the debt but rather more likely to *say* they would decline to pay it. And certainly, social psychology has taught us enough about the disjuncture between attitudes and behavior to understand at once that these are not the same thing. What people *say* they would or might do in an entirely hypothetical and arbitrary situation and what they would *actually* do when confronted with a real-life situation are, of course, very different. Witness the difference between people who *say* they are going to vote in an upcoming election and those who actually vote.

6. It is not the case that IRB approval of a study is somehow a testament to its scientific validity, only that it meets certain minimal standards of respect for the rights of participants. IRB review is *not* peer-review. At the University of Central Florida, research of this general sort (meaning Internet surveys, whether coupled with an experiment design or not) would satisfy the "less than minimal risk" standard and therefore would be declared Exempt from full IRB review.

7. The survey contains obvious sources of unexamined potential bias, aside from the biases inherent in the design itself. In particular, women and the well-educated are over-represented in the survey results. There are good reasons why these biases exist; indeed, without extraordinary measures, they would exist in practically any Internet-based data collection effort. But in that case, it would be worth knowing how serious these biases are, which is to say, whether men and women, or the well-educated and the less-educated, responded

---

[1] http://www.pewresearch.org/daily-number/number-of-americans-who-read-print-newspapers-continues-decline/

2

differently to the hypothetical situation posed to them. This would be simple to do but I can find no evidence that it was done.

A final point is that restricting one's sample to newspaper readers and then to those readers with Internet access, and then (unintentionally) over-sampling better-educated respondents, means that this cannot be considered a sample of "unsophisticated consumers" by any standard.

*James Wright*

3